## Case No. 1,673.

### The BOSTON.

[1 Sumn. 328;[1] 11 Am. Jur. 21.]

Circuit Court, D. Massachusetts. May Term, 1833.

SALVAGE — RIGHT TO — FORFEITURE — EMBEZZLEMENT—AMOUNT—DERELICT—PARTIES — LIBEL—ANSWER—EVIDENCE — APPEAL—WITNESSES—INSURANCE—DEVIATION.

1. In a libel for salvage, all the parties should be inserted and brought before the court.

[Cited in McConnochie v. Kerr, 9 Fed. 60.]

2. Libels in admiralty, especially those for salvage, are usually too loosely framed. They should state the subject matter in articles, with certainty and precision, and with averments admitting of distinct answers.

[Cited in Wells v. The Anne Caroline, Case No. 17.389a; Dupont de Nemours v. Vance, 19 How. (60 U. S.) 175; Card v. Hines, 35 Fed. 600.]

3. The answer should meet each material allegation of the libel with an admission, a denial, or a defence.

[Cited in Dupont de Nemours v. Vance, 19 How. (60 U. S.) 175; Card v. Hines, 35 Fed. 600.]

4. No evidence is admissible, except it be appropriate to some of the allegations in the libel or answer.

[Cited in The Morton, Case No. 9,864; The Sarah E. Kennedy, 29 Fed. 266; In re Hawkins, 147 U. S. 486, 13 Sup. Ct. 512.]

5. In admiralty proceedings, a supplementary libel alleging new matter, and an answer thereto, may be filed after appeal, at the discretion of the court.

[Distinguished in The Mabey v. Atkins, 10 Wall. (77 U. S.) 420. Cited in The Morton, Case No. 9,864. Distinguished in the Saunders, 23 Fed. 304. Cited in The Venezuela, 3 C. C. A. 319, 52 Fed. 875; Re Hawkins, 147 U. S. 486, 13 Sup. Ct. 512.]

6. In case of a supplementary libel being filed after closing the testimony on the original libel in prize causes, the new testimony taken must be applicable merely to the new allegation; but in other causes this rule is much relaxed.

7. Since the act of March, 1803, c. 93 [2 Story's Laws, 905; 2 Stat. 244, c. 40], in admiralty, as well as equity cases, carried up to the supreme court by appeal, all the evidence goes with the case, and it must accordingly be in writing.

8. In a libel in rem, against a vessel or cargo for salvage, the underwriters, not having accepted an abandonment, are not proper parties.

[Cited in The Idaho, Case No. 6,996; The Senator, Id. 12,665.]

9. A stoppage to save the crew of a wrecked and sinking ship, whose lives are in jeopardy, is justifiable, and is not a deviation, that discharges underwriters; but a delay to save property is such a deviation. See The Henry Ewbank [Case No. 6,376].

[Cited in The Emblem, Case No. 4.434; Sturtevant v. The George Nicholaus, Id. 13,-578; Peterson v. The Chandos, 4 Fed. 653; The Centurion, Case No. 2,554; Roff v. Wass, Id. 11,999.]

10. Where the master and crew had left their vessel in a sinking condition, and taken to the long boat, and were picked up by another vessel, while yet in sight of the wreck, the vessel and

---

[1] [Reported by Hon. Charles Sumner.]

cargo, thus left, are considered, in admiralty, as derelict.

[Cited in The John Gilpin, Case No. 7,345; The H. B. Foster, Id. 6,290; Sturtevant v. The George Nicholaus, Id. 13,578. Distinguished in Cromwell v. The Island City, Id. 3,410. Cited in The Georgiana, Id. 5,-355; The Ann L. Lockwood, 37 Fed. 237.]

11. On appeal in salvage cases, the court of appeal does not alter the amount of salvage upon slight grounds, or inconsiderable differences of opinion.

[Cited in brief in Lubker v. The A. H. Quinby, Case No. 8,586.]

[12. Cited in The Maggie P., 25 Fed. 206, to the point that a party who does not appeal from a decree cannot question its correctness.]

[13. Cited in Sewell v. Nine Bales of Cotton, Case No. 12,683, and The Henry Ewbank, Id. 6,376, to the point that under ordinary circumstances the owners of the salving vessel are entitled to one third.]

[14. Cited in The John Gilpin, Case No. 7,-345, to the point that salvage service may be rendered within the ebb and flow of the tide, without regard to location, whether on the high seas, or inter fauces terrae.]

15. The right of salvage is forfeited by embezzlement on the part of the salvors.

[Cited in The Rising Sun, Case No. 11,858; Williams v. Waterman, Id. 17,745; Cromwell v. The Island City, Id. 3,410; The Mulhouse, Id. 9,910; Harley v. Gawley, Id. 6,069; U. S. v. Stone, 8 Fed. 251; The Albany, 44 Fed. 435.]

[16. Cited in The Mulhouse, Case No. 9,910, to the point that embezzlement by the salvor crew does not work a forfeiture or diminution of the shares of the owner, where there is no fault on his part.]

[17. Cited in The Rising Sun, Case No. 11,-858, to the point that embezzlement by a master who is part owner forfeits his rights to salvage both as master and owner.]

18. Embezzlement in port is a forfeiture no less than at sea.

[Cited in Cromwell v. The Island City, Case No. 3,410.]

19. Embezzlement by the salvors, after the property is put into the hands of the marshal, is a forfeiture of salvage; and that, whether the custody of the property be at the time given to the salvors or not.

[Cited in The Missouri, Case No. 9,654; Cromwell v. The Island City, Id. 3,410.]

[20. Cited in The Mulhouse, Case No. 9,910, and Browning v. Baker, Id. 2,041, to the point that, while it is the policy of the law to liberally reward all meritorious salvage service, it will punish every negligence with diminished compensation or forfeiture.]

21. The rules of the common law, as to the competency and incompetency of witnesses, are adopted in the admiralty, in the exercise of its jurisdiction as an instance court.

[Cited in The Neptune, Case No. 10,120; The Peytona, Id. 11,058.]

22. The case of salvage is an exception to the rule, as to the incompetency of witnesses on account of interest. The salvors are, from necessity, witnesses as to facts occurring at the time of the salvage service; but only as to such facts.

[Cited in Bean v. The Grace Brown, Case No. 1,171; The Peytona, Id. 11,058; Roberts v. The St. James, Id. 11,914.]

23. The testimony of persons, who are parties to an admiralty suit, ought to be taken under a special order of the court showing the cause, that the court may in its order limit the inquiries to matters within the exception to the rule, that parties are not witnesses.

24. In a salvage suit in admiralty the salvors, being parties to the suit, are not competent witnesses as to facts occurring in port after the property is brought in.

25. The testimony of interested witnesses weighs little in opposition to that of those disinterested.

[Cited in Bean v. The Grace Brown, Case No. 1,171; Roberts v. The St. James, Id. 11,914.]

[See Andrews v. Hyde, Case No. 377.]

In admiralty.

T. Parsons and W. G. Stearns, for claimants and appellants.

B. Sumner and I. McLellan, Jr., for libellants and appellees.

STORY, Circuit Justice. This is a suit for salvage, brought before the district court by an original proceeding in rem against the schooner Boston, of Eastport, and cargo.[2] The original libellants were the master and owners of the schooner Magnolia of Hallowell, in the state of Maine, asserting a claim as salvors. By a supplemental libel, the crew of the Magnolia were brought before the court as salvors, as in strictness they ought to have been by the original libel, either by name, or by a description of their character. The libel, whether filed by the master, or owners, or both, should have been in behalf of themselves, and the officers and crew of the saving ship. I take this opportunity of adding, that the manner, in which libels of all sorts, and especially of salvage, are usually framed, is quite too loose and general. They should state the matter with all due certainty and precision, (though not indeed with the nicety of the common law proceedings,) in distinct articles, each propounding, or, as the admiralty phrase is, articulating some material allegation, capable of a distinct answer and proof, if controverted; and the answer should accordingly reply to each article by a clear and exact admission, or denial, or defense to the matter of it. In this way we should arrive at that distinct knowledge of the real points of controversy, which is so desirable for the court, and to that just regard to the rules of admiralty pleadings, which is so essential to vindicate its equity, and facilitate its practice. But to return to the case. A claim was interposed by Ezekiel Foster, of Eastport, as owner of the Boston, and by the Suffolk Insurance Company, as underwriters on the vessel, and by other persons as claimants of the cargo. The claims admitted the salvage service; and the question therefore was reduced at the hearing in the district court to

[2] Salvage proceedings may as well be by process in personam as in rem. The Hope, 3 C. Rob. Adm. 215; The Trelawney, 3 C. Rob. Adm. 216, note.

the mere consideration of the amount to be awarded to the salvors. The decree of the district court awarded to them two-fifths of the value of the schooner and cargo; one-third of the salvage was given to the owners of the Magnolia; the residue was divided into ten shares, of which the master was to receive five, the mate two, and the remaining three were distributed equally among the crew, consisting of three persons. No appeal was interposed by the libellants, either as to the amount of salvage, or as to the distribution; and, therefore, as to the latter, there is now no controversy. But an appeal was interposed by the claimants generally; and of course this brings the amount of the salvage regularly in question before the court.

After the appeal, new facts, material to the defence of the claimants, and indeed constituting a new defence as to some of the salvors, having come to the knowledge of the claimants, it became necessary to open the cause, so as to let them in. Nothing is clearer, than that in the then posture of the allegations no proofs were admissible, except to facts put in issue, by them; for in all admiralty proceedings the decree must be secundum allegata et probata. It is not sufficient, that there are facts proved, which might have a material bearing, unless there are allegations suited to bring them as matters of plea and controversy before the court. The charge, thus newly brought forward by the claimants, is of a very grave nature, that of a deliberate embezzlement of the salvage property by the master, officers, and crew. And it being clearly established, that the knowledge of the circumstances had not been brought home to the claimants until after the decree of the district court, this court had no difficulty, at a former hearing, in allowing the claimants to file a supplementary answer and defence on this point; for it is the well known usage of admiralty courts, even after an appeal, in fit cases, in their discretion, to allow either party to file new allegations and proofs; non allegata allegare, et non probata probare. There is a restriction, too often forgotten in practice, modo non obstet publicatio testium, the effect of which is to exclude new testimony, to the old articles, where any has been already offered, and to confine it to the new articles, or to those of which no proof was formerly given. 2 Brown, Civ. & Adm. Law, 500, 501; Id. 436, 437. This restriction is founded upon the same principles as the chancery practice, not to admit, after the publication of the testimony, any new proofs; and was probably derived from a common source, the civil law. 1u. In the actual frame of our laws the restriction is in many cases overlooked or abandoned; but it is still retained in prize causes, where further proof stands upon the direct order of the court itself.

The supplemental answer having been filed, and stating (as it properly should) in distinct articles the charges of embezzlement, though not with so much certainty as is desirable, the libellants filed a defensive allegation, repelling the charges throughout. Upon the issue thus framed, new testimony was taken; and by the direction of the court it was taken under commission and reduced to writing. And I beg here to repeat, what was stated at the bar at the time, but seems not to have been generally understood in practice; that since the act of the 3d of March, 1803, c. 93 [2 Story's Laws, 905; 2 Stat. 244, c. 40], in admiralty causes, as well as in equity causes, all the evidence originally taken in the circuit court, in cases capable of appeal, must be transmitted to the supreme court; which cannot be, unless the same is reduced to writing; and no new supplementary evidence can be received in the supreme court, except in admiralty and prize causes; which rule presupposes, that all the old evidence is already in the record.

The cause has now been argued most elaborately upon all the facts touching both points; first, the amount of salvage; and secondly, the charge of embezzlement. If the latter is made out, it is not pretended to go to the whole extent of the salvage; but only to the shares of the guilty parties. And, inasmuch as the seamen have been examined as witnesses by the claimants, upon the implied faith, that their testimony fully given shall not be used to prejudice their claim to salvage, it is understood, that the charge of embezzlement does not extend to them; but is confined to the master, (who is also a part owner,) and the mate.

It is observable, that the Suffolk Insurance Company have asserted a claim in this court, as underwriters upon the schooner Boston. But their claim nowhere alleges, that any abandonment has been made to them; and if it had, unless they had accepted it, they would have had no right in rem. There is, indeed, in a prior interlocutory proceeding upon petition for the delivery of the schooner upon an appraisement, an allegation by the company, that there has been an abandonment made to them, but not accepted. This would not help the deficiency in the averments, if the claim were otherwise sufficient. But of itself, it proclaims the company out of court. Nothing is clearer in the course of admiralty proceedings, than that no person can make himself a party claimant to a proceeding in rem, except he be the actual owner thereof. It is not sufficient, that he may have an interest in the controversy. He must have an interest in the property itself, in a legal and technical sense; otherwise he has no persona standi in judicio. The claim, therefore, so far as respects the Suffolk Insurance Company, must be dismissed, as res inter alios acta, as to which the court can exercise no jurisdiction, and take no notice, in this case.

The claimants have made some suggestions in regard to the distribution of the salvage. But it appears to me, that this is a subject with which they have, strictly speaking, no right to intermeddle. They have an interest to lessen the amount of salvage; but here their interest ceases. How it should be distributed, is matter of consideration for the salvors, and for the court, in the discharge of its own appropriate duties. If, indeed, the charge of embezzlement is made out, the claimants are entitled to withhold salvage from the offenders. But as to the distribution of the salvage actually awarded to others, they have no legal interest or concern.

Having disposed of these preliminary matters, I now come to the consideration of the first point in the cause, the amount of salvage. The facts of the cause upon this point are these.—The schooner Boston, with a cargo of flour and corn, and some bales of feathers on board, being bound on a voyage from Baltimore to Portland, was, on the night of Wednesday, the 25th of September, 1832, run down by a topsail schooner, it being dark and hazy, and the wind blowing heavy from the northwest. The Boston filled with water in about ten minutes, and the schooner, by which she was run down, kept on her way. Finding the Boston in a sinking condition, as was supposed, the master and crew, being seven in number, took to the long boat, and left her as soon as possible. In about an hour after leaving her, and being about two or three miles distant from her, they came across the Magnolia, then on a voyage from New York to Boston, and got aboard of her about one o'clock in the morning. It was then still blowing very hard. The Magnolia had just before been injured by some unknown vessel, which had run afoul of her, and she was leaking badly, so as to require one person at the pump until the weather moderated, when it was found, that the covering plank on her starboard bow was started, and her timberheads were stove in. Capt. Davis (the master of the Magnolia), at the suggestion of the master of the Boston, continued to lie to under a three-reefed mainsail and a foresail, to wait and see the situation of the Boston; and at daybreak, about six or eight miles distant, they descried a vessel from the mast head, (which proved to be the Boston,) and bore away for her, and run down for her about S. E. or S. S. E., and came up with her about six o'clock in the morning. Capt. Davis sent his boat with some men on board. The Boston was then full of water, and the sea breaking over her, the wind still continuing to blow hard. The opinion of the masters of both the vessels at that time was, that the Boston would roll over and sink, and that she was in danger of sinking every hour. It was thought best to strip her of her sails and rigging, and whatever else could be saved, and accordingly Capt. Davis and his crew went on board, and brought back to the Magnolia her foresail, jib, flying jib, and some rigging. The Magnolia continued by the Boston until two or three o'clock in the afternoon of the same day, when the wind began to abate, and Capt. Davis concluded then to hitch the Boston to his own vessel by a chain cable and hawser, and take her in tow into port. She was then about twenty or thirty miles distant from Cape Cod, and from the time she was first seen until taken in tow, she had drifted out to sea about ten miles, and towards Nantucket shoals. She was accordingly taken in tow, and arrived in Boston harbour on Saturday, the 28th of September, about noon, being all this time full of water; and was towed up to the wharf by a steamboat.

Such are the most material facts, as they appear in the evidence, and principally as they are stated by the master and mate of the Boston. And upon this posture of the facts it is difficult to escape from the conclusion, that it is a most meritorious case of salvage. At the time when the salvage service was performed, the Magnolia was herself in a somewhat crippled state, and she and her cargo were of the aggregate value of fifteen thousand dollars. Beyond all question, at least in my opinion, it was the duty of the master of the Magnolia to interrupt his voyage for the purpose of taking on board the crew of the Boston in their suffering state, for the safety of their lives. It was a duty thrown on him by the first principles of natural law, the duty to succour the distressed; and it is enforced by the more positive and imperative commands of Christianity. The stopping for this purpose could not, in my judgment, be deemed by any tribunal in Christendom a deviation from the voyage, so as to discharge any insurance, or to render the master criminally or civilly liable for any subsequent disasters to his vessel occasioned thereby. But beyond this there was no supervening or imperative duty. The master was under no obligation to lie by in order to save property, or to delay the proper progress of the voyage by gathering up the fragments of shipwreck, or other perils of the sea. Any stoppage for such purposes would of itself amount to a deviation; and any going out of his course for such a purpose, being wholly unauthorized, would discharge the underwriters from all future responsibility. But the maritime law, looking to the general benefit of commerce, upon a large and comprehensive policy, does not prohibit the master, under such circumstances, from deviating to save property in distress, if he deems it fit in a sound exercise of his discretion. As between himself and his owners, the usage of the world has clothed him with this authority; and in return for such extraordinary hazards, it has enabled the owners to partake liberally in the salvage awarded for the meritorious service, when it is successful.

It has been said, that the present is not a case of strict derelict, in the sense of the maritime law. But I rather doubt that position, if the true meaning of derelict in that law be, as I take it to be, a thing found abandoned or deserted on the seas. And it is clear in this case, that the abandonment, though voluntary, was without any intention to return. See Rowe v The Brig [Case No. 12,093]. The case was treated by the master and crew, as one of irretrievable foundering, when they left the vessel in the long boat. The subsequent change of opinion and action under new circumstances cannot affect the nature of the original transaction. The original animus non revertendi was not done away by the new enterprise, under the auspices of the Magnolia. But the case, in point of merit, is in no degree changed, if it should be deemed not a case technically of derelict. It approaches as near to one, if it be not one, as can well be conceived. It is a case of quasi derelict, where all hope of recovery, for the time being, was entirely abandoned. The vessel was certainly in a situation of extreme danger and distress. She was water-logged and drifting to sea, and, as the testimony states, she was drifting in a direction toward the south shoal of Nantucket, which was at but a short distance; and, unless relief was promptly obtained, there was imminent danger of her being totally lost on that shoal. If the weather had continued boisterous, with any thing like the severity of any of the customary equinoctial gales in September, her fate, as a lost vessel, was inevitably sealed. She was, then, snatched from the very jaws of destruction by the enterprise and prompt assistance of the master and crew of the Magnolia. The circumstances of this case are not at all like those of the Emulous, Simpson, &c., claimants in this court, alluded to at the bar [Case No. 4,480]. There the hazard was not for the moment so imminent, nor the means of other succour so distant, doubtful, or unattainable. If succour had not been given by the Magnolia, there is every reason to suppose, that none could at a subsequent period have been effectual; for every hour of delay was fraught with additional danger, from the nature of the cargo, the situation of the vessel, and the drift of the currents. The rule of the maritime law here is, as in other cases, where public policy points to promptitude and zeal in rendering services, Bis dat, qui cito dat.

In cases of derelict, the well-known and favored rule in ordinary cases is, to allow one half as salvage. Although it is not an inflexible rule, yet it is rarely deviated from, except in cases of very extraordinary value, or of very slight hazard. The value of the Boston and cargo is not so large as to call for any deviation from the common rule on that account; for it does not exceed the sum of nine thousand four hundred dollars; the value of the vessel being $4500, and that of the cargo, $4894.70. The hazards encountered by the salvors were not, indeed, very great, beyond the putting the Magnolia and her cargo at the risk of the owner of the vessel. It is said, that the Boston was so hitched to the Magnolia by the chain cable, that from want of suitable implements to unlock the cable, in case the Boston had gone down, the Magnolia must have shared a common fate. If this were so, it ought not to enhance the measure of the salvage; for the master of the Magnolia ought to have guarded against any such probable danger, and he cannot avail himself of his own negligence to found any additional title to salvage. On the other hand, I should be sorry to lay down any doctrine, by which it should be supposed, that if, in a highly meritorious case of salvage, of derelict, or quasi derelict, there was subsequently no great hazard or labor of an exhausting nature, the salvage was therefore subject to great diminution. I should fear, that such a doctrine would be found as mischievous in practice, as it would be unjust in principle. Upon questions of this nature, a large discretion must of necessity belong to the public tribunals. It is of great importance, as far as it can be done, to avail ourselves of fixed rules and habits in the administration of this delicate duty; and not to deviate from them, except upon urgent occasions. The rule of salvage in cases of derelict usually is, (as has been said,) to give one half; and it has rarely been below two fifths of the value of the property. The learned judge of the district court has adopted this latter proportion, and I am unable to see any solid ground of objection to this exercise of judgment.

There is another rule, which has been repeatedly enforced in this court, and in the supreme court of the United States, in cases of this nature; and that is, not to encourage appeals upon slight grounds of difference in cases or in opinions. Probably no two minds, acting often independently of each other, would always arrive at exactly the same conclusion, as to amount, in cases of discretionary salvage. Yet each might act for itself with the utmost caution, and care, and sagacity. I have endeavoured in all cases to keep this consideration in view; and the decisions of the supreme court admonish me rigidly to adhere to it. Where I cannot perceive a plain and palpable departure from the true principles of salvage, I shall not feel at liberty to reverse a decree upon the mere ground, that I might not originally have awarded the same amount. In the present case, I need not put myself upon this peculiar reason; since I entirely concur in the rate of salvage given by the district court.

We next come to the consideration of the question of embezzlement, a charge of a most serious nature, and deeply affecting the character of the parties implicated. The maritime law demands from all persons engaged

in maritime concerns scrupulous good faith and uprightness of conduct. And it prescribes this most emphatically to salvors, giving them a liberal reward for fidelity and vigilance, and visiting them with severe reprobation and diminished compensation for every negligence. See Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; Abb. Shipp. pt. 4, c. 3, § 5, p. 272, note; Spurr v. Pearson [Case No. 13,268]. But in cases of embezzlement the law would fall short of its usual foresight, if it did not inflict a more admonitory punishment. Accordingly, it will be found, I believe, in the maritime jurisprudence of the whole world, that embezzlement by salvors, directly, or by connivance, is punished by a forfeiture of all claim to salvage. In morals, in general justice, in sound policy, it should be so; for what can be more inhuman, or more thoroughly without apology, than to plunder the distressed, or to add the losses of fraud to the unavoidable calamities of shipwreck? In the American and English law the doctrine is fully recognised; and it is applied with an unfaltering firmness, whenever the fact is clearly established. See Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; Abb. Shipp. pt. 4, c. 3, § 5, p. 272, note; Spurr v. Pearson [supra].

In the present case the embezzlement is charged to have taken place, not during the voyage, but after the arrival in port; but whether before or after the schooner and cargo were in the custody of the marshal under the admiralty proceedings for salvage, or before, or after, or during the time of the entering of the cargo, is left uncertain in the answer. I say, it is charged to have been in port; not indeed in the supplemental answer, as it ought to have been, (for in this respect the answer is quite too loose, and uncertain, and open to exception,) but in the argument on both sides, and in the evidence adduced to support and repel the charge. Under these circumstances, a question has been made, on the part of the libellants, whether, supposing the embezzlement to be established in proof, after the cargo was in the custody of the marshal, it amounts to anything more than mere theft, punishable in a criminal proceeding, but not touching in any manner the right to salvage. The argument is, that the embezzlement, to work a forfeiture, must be perpetrated by the salvors during the voyage, or at least during their possession of the salvage property; and that it cannot apply after the property is in the custody of the law. And great reliance is placed on the reasoning in the case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, as confirming this distinction. It is a sufficient answer to that case to say, that no decision was had upon this point. The argument was indeed pressed by the counsel; but the court, without in the slightest degree countenancing the validity of the distinction, held, that it did not apply to the case; for, whether the asserted

embezzlement took place at sea or in port, it occurred before the salvors had parted with the possession of the vessel or cargo.

I take it to be very clear, according to the course of admiralty proceedings, that no person can come into that court and ask its assistance, unless he can ex aequo et bono make out a case fit for its interposition. A court of admiralty is to the extent of its jurisdiction, at least in cases of this sort, a court of equity; and the same rule applies here, as in other courts of equity, that the party, who asks aid, must come with clean hands. In cases of salvage, the party founds himself upon a meritorious service, and upon the implied understanding, that he brings before the court, for its final award, all the property saved with entire good faith; and he asks a compensation for the restitution of it uninjured, and unembezzled by him. The merit is not in saving the property alone; but it is in saving and restoring it to the owners. However meritorious the act of saving may have been, if the property is subsequently lost, and never reaches the owner, no compensation can be claimed or decreed. The proceeding need not indeed be in rem; for if the thing has come to the possession or use or benefit of the owner, a compensation may be equally decreed upon a libel in personam. So is the doctrine in The Hope, 3 C. Rob. Adm. 215, and The Trelawney, Id. 216, note; and it is founded in the very nature of the admiralty jurisdiction, which primarily acted in personam; and now acts in rem, only as auxiliary to its general authority. The compensation to be awarded, therefore, presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach, or under the control, of the salvors. What claim could be more extraordinary than an annunciation by a salvor in a court of justice, that he had saved the property, and had afterwards perpetrated a gross fraud or theft upon the owner, for the purpose of withdrawing the property from him; and then to ask, in the same breath, for a compensation for his labor, notwithstanding his iniquity? Such a claim, it seems to me, would be at war with the first principles of justice, and certainly with those of all maritime jurisprudence. I hold, that every act of misconduct of the salvors, as to the property, fraudulently or wantonly done to the injury of the owners, at any time before the salvage is decreed, is to be treated in the same way, as if it had occurred, while the property was in their exclusive possession. They are not responsible indeed for embezzlement or fraud committed by strangers after the property has passed into the custody of the marshal; nor indeed before, unless it has been occasioned by their own gross negligence.

But it is not quite correct in point of fact to say, that the possession of the salvors was in this case absolutely devested by the cus-

tody of the marshal, under the process. His possession is not adverse to that of the salvors; but the property is deemed in the possession of the law for the benefit of all concerned. It is notorious, that in practice the marshal is accustomed to allow the salvors to have free access to the property, (at his own peril indeed,) and to place great confidence in them. In the present case, the master and mate of the Magnolia superintended the delivery under the direction of the marshal; and the master is stated in the evidence to have watched over it during the night. He was confided in by all parties for this purpose, and if he has abused that confidence, I should hope, that the law was strong enough to deal out to him a due measure of retribution. Suppose, by a connivance between the under officers of the marshal and the salvors, embezzlement should take place after the property is in the custody of the law, what answer will it be, that they were criminally liable for the theft, but that they stood civiliter blameless? For myself, I cannot entertain a doubt, that salvors are responsible civiliter for their conduct in relation to the salvage property, so long as it is subject to the decree of the court. It is a wholesome doctrine, and it makes it the interest, as well as the duty of salvors, to act with good faith, and never to sleep on their posts, or to make a merit of their frauds.

There is another point raised at the argument, which is necessary to be discussed before we proceed to the examination of the facts respecting the asserted embezzlement. The testimony of the master and the mate, (both of whom are libellants,) has been taken as evidence in the case, not simply to the facts occurring at the time of the salvage service; but to all the other facts in the case touching the embezzlement. Their testimony is objected to as incompetent; and its competency must now be determined on by the court. In general, it may be said, that the rules, as to competency and incompetency of witnesses, known to the common law, are adopted in the court of admiralty in the exercise of its jurisdiction, as an instance court. The proceedings on the prize side of the court are of a peculiar nature, and are governed by a peculiar mode of practice. See 2 Wheat. [15 U. S.] Append. 25, 26; The Drie Gebroeders, 5 C. Rob. Adm. 343; The Amitie, Id. 344, note, 6 C. Rob. Adm. 269, note; Robinett v. The Exeter, 2 C. Rob. Adm. 267. Generally speaking, in instance cases, the court of admiralty deems a person incompetent as a witness, who is a party to the cause, or has an interest in the event of it. The civil law has the same rule,—Nullus idoneus testis in re suâ intelligitur. Dig. Lib. 22, tit. 5, 1. 10; Dom. Civ. Law, book 3, tit. 6, § 3, arts. 6, 8. See, also, The Hope [Case No. 6,678]. It has accordingly been held by some judges, that seamen are not witnesses for each other in cases,

where an embezzlement is charged upon all of them, to which they must contribute. This would seem to be correct, where all are parties to the suit; but if not parties, then it is a several suit, and the decree in one case has no legal bearing on that in another. In such a case the objection goes to the credit, (as an interest in the question,) and not strictly to the competency. See Hoyt v. Wildfire, 3 Johns. 518; Lewis v. Davis, 3 Johns. 17; Spurr v. Pearson [Case No. 13,26S]. The rule is not only regularly true in the admiralty, that a person is incompetent, as a witness, on account of interest; but it is sometimes pressed beyond the rule of the common law. Thus, where a joint capture is set up on account of the party's being in sight at the time of capture, the testimony of witnesses of the ship, asserted to be a joint captor, is not sufficient, per se, to found the claim, although they are releasing witnesses. See, also, La Belle Coquette, 1 Dod. 18; The John, Id. 363; The Galen, 2 Dod. 19; The Arthur, 1 Dod. 423, 428. But there are some exceptions to the rule, as to interest, founded upon necessity; such as in cases of salvage, where the facts must often come in a great measure, if not exclusively, from the salvors themselves. What, for instance, could otherwise be done in cases of naked derelict, unaccompanied by any possibility of getting information from the crew of the deserted ship? The constant course of practice has been in salvage cases, to allow the testimony of the salvors to be taken, as to the facts occurring at the time of the salvage service, and especially where these are exclusively within their knowledge. See the case of The Charlotte Caroline, 1 Dod. 192. Of course, the evidence, being of interested persons, is in the nature of semi-plenary evidence only, and will weigh little, unless corroborated by other circumstances. It will be of less weight, where it leaves behind it disinterested testimony, which might be taken; and it will be greatly abated in force by opposing testimony from persons belonging to the crew of the saved ship. Cases furnishing a like analogy may be found in the prize court. The Galen, 2 Dod. 19. But I am not aware, that the rules of evidence have been relaxed beyond this point. Salvors have not been admitted, as far as I know, to give testimony to other facts, capable of distinct and independent proof; but are admitted, ex necessitate, to such matters only as found the original claim. Indeed, in strictness, the testimony of persons, whether salvors or others, who are parties to the suit, ought not to be taken, except under a special order of the court for this purpose, showing a cause, as is done in the ordinary course of chancery proceedings. In the looseness of our practice, it is often done without such an order. But it is irregular; and it would be well, that the irregularity were corrected, as the court might in its order limit the inquiries.

to matters properly within the scope of the exception. Upon the whole, my opinion is, that the testimony of the master and the mate of the Magnolia, not being to the res gestae of the salvage service, but offered as general evidence to all matters touching the embezzlement, is inadmissible in point of law, and must be suppressed. It is incompetent upon the general principle, because it is from parties, who are interested. It is within no known exception to that principle, for it is not ex necessitate. It might have furnished matter fit for a special replication to the charge of embezzlement; and, if thus put in upon oath, it might have been in the nature of an expurgatory reply. It can now be deemed of no more efficiency in the cause, than a proffer of a personal examination, and denial of the charge upon oath, which has not been accepted on the other side; and which, therefore, relieves the cause from the suggestion of any voluntary concealment by the parties implicated of their own knowledge of the facts.

But, if the testimony were admissible, it could avail but little against the opposing testimony of persons not similarly situated. If releasing witnesses in the case of a common interest are heard with so much reluctance and so much distrust by courts of admiralty, that no decree will ordinarily be pronounced upon their uncorroborated evidence; how much more forcible must the objection be to persons, who testify under the strong sense of a present, deep, personal interest, and who stand, as it were, in vinculis, to disprove a charge made against them of deliberate fraud and embezzlement? The law, indeed, with the most entire justice, as well as humanity, presumes them innocent of such a charge, until it is established by credible evidence. But if it is so established, it is difficult to perceive, upon what legal ground the court could admit the mere denial of the parties, however solemn, to outweigh what, it is bound to believe, is satisfactory proof. I do not know, indeed, whether under all the circumstances of the present case, my judgment is materially affected by the consideration, that the testimony of the master and mate is in, or out of the record. I have gone at large into the subject, more from a regard to the principles of evidence, than from any great importance, which the testimony bears in the cause, taken under all its aspects.

The charge is, that the master and mate of the Magnolia have embezzled a number of barrels and half-barrels of flour of the cargo of the Boston, of the value of $100; and a part of the rigging, furniture, and appurtenances of the vessel itself, of the value of $200. Of course, the burden of proof of such a charge is upon the claimants; and the question is, whether it is sufficiently made out in the evidence beyond a reasonable doubt. If it is not, the court is bound to dismiss it from its consideration; if it is made out, it is equally the duty of the court, however painful to itself, or disagreeable to the parties accused, to pronounce the proper sentence.

Each of these items of charge will require a separate and independent consideration. And first, as to the flour. It appears by the bills of lading of the Boston's cargo, that she took on board, at New York, six hundred and seventy-four barrels and ninety-eight half-barrels of flour. When the unloading of the cargo took place at Boston, the hatches were found undisturbed; and after the unlading was completed, the marshal received and sold at auction six hundred and fifty-two whole barrels and eighty-six half-barrels only of the flour. So, that there was a deficit of twenty-two whole barrels, and twelve half-barrels of the cargo. How is this accounted for? The master of the Magnolia admits, that he attended to the discharge of the cargo, until it was finished, and watched it after the unlading during the nights, until it was sold. It has been said at the argument, that there might have been some mistake as to the quantity of flour originally shipped in the Boston. But this, to say the least of it, is very improbable, and is wholly unsupported by any evidence. But that, which is mainly relied on, is the allegation of the master, that on discharging the cargo a good many barrels of flour were found stove and wasted between the corn and the water. And he asserts, that the manner, in which the cargo was stowed, was in successive tiers of barrels, with corn put in between each tier to fill the scantlings; that the hold was full; that when the hatches were opened, the barrels were jammed so tight under the beams, from the swelling of the corn, that it was impossible to get them out without staving a barrel to get room, so as to use a crow-bar. Now, taking this representation either as evidence or as argument, is it fully supported by the other testimony in the case? I think I may say, that it certainly is not. It is true, that a witness, John Davis, a wood-corder and truckman, who assisted in taking care of the schooner, and in unloading the cargo, asserts, "that the flour on top was a good deal stove; many of the barrels broken. As to the rest, some were so much swollen, that the heads came out in unloading." And he adds, "I got the cooper to get three empty barrels, and we put into them the flour, that had been spilt in unloading. I think that there were three barrels. The top tier of barrels was knocked about so, that a great many of the barrels were stove to pieces, and the flour was out. I mean by that, one head was out;—some of the barrels had two heads out." This is a strong statement. He concludes by affirming, that they "found the barrels of flour more or less stove, from the top to the bottom of the cargo." But, let us see,

how far this statement agrees with the testimony of the cooper himself, a man admitted to be of credit, and disinterested, who was employed in the cooperage during the whole time of the delivery. He says, that the principal part of the coopering was done while the barrels were on the wharf. "They were piled up in tiers, and some of the heads or pieces of them came out. The flour generally came out of the vessel in good order." In answer to a question, whether any of the barrels were stove to pieces, he says, "I saw none, to my recollection;—not a barrel." He adds, that he thinks, if any had been stove, he should have seen them; and from the manner of stowing the flour with corn, he should not, under the circumstances, have expected to find any flour stove; and he concludes in answer to a question, whether he recollected any flour being gathered up, that came out of the barrels on board of the Boston, and put into other barrels, which were afterwards coopered, by saying, "I saw none." Now, it cannot be disguised, that this evidence is essentially at variance with that of John Davis. Then, there is the testimony of the deputy marshal, in whose custody the vessel and cargo were, and under whose direction the cargo was delivered. He says, "There were a number of barrels of flour stove," (meaning, as he says, by "stove," that the heads were partially stove in, and one or two of them were lying on the wharf with their heads out, but the barrels were otherwise entire;) "there were between forty and fifty repaired by the cooper, some barrels and some half-barrels. I did not notice any, that were wholly stove to pieces;—they were in bad condition, and the worst were coopered; the flour not out of some of them;—the water had mixed and made a paste of some of them." In answer to a question, whether there could have been as many barrels as eight or ten in staves, or stove to pieces, lying about or on the decks, without his seeing it, while in charge of the vessel, he answers, "No; there was no such thing to my knowledge;—I did not see them. I should certainly have seen it; if there had been any thing of the kind, I should have seen it." He says, that he was down to the vessel two or three times a day, and stayed, sometimes one hour, sometimes three or four hours, and sometimes all the forenoon. He did not see any empty barrels, except among the dunnage, after the cargo was discharged. He does not recollect, whether there was any flour at all spilled among the corn; the barrels, whose heads were out, were nearly full of flour; he should say, they were full barrels. He adds, (what is denied by John Davis, the witness,) that there was a communication open between the cabin, and steerage, and hold, through which barrels of flour could have been taken into the cabin.

Now, upon this state of the evidence, it seems to me difficult to escape the conclusion, that Davis the witness's account of the state of the flour upon the delivery is a gross exaggeration. It is impossible for the court to believe, that the deficit of twenty-two barrels of flour, and twelve half-barrels, can be accounted for by any breakage of the barrels and spilling of the flour, ascertained upon the unlivery. If the loss had been of three or four barrels only, it might be accounted for in this way; at least, the court would have presumed in favor of it, rather than for such a trifling amount have pressed home an imputation of gross negligence or fraud. The present deficit cannot be accounted for, except upon the presumption of gross negligence or embezzlement, on the part of some persons intrusted with the unlivery, or having confidential access to the property.

But the case does not stop here. In point of fact, ten barrels of flour of the Boston's cargo, were actually conveyed in the Magnolia from Boston to Hallowell, and there sold by the master of the Magnolia, as his own property. This is admitted by the master himself, and is established beyond controversy in the evidence. The sale of the Boston's cargo by the marshal was on the sixth day of October, 1832. The Magnolia sailed from Boston for Hallowell on or about the 25th of the same month. In the manifest of her cargo, sworn to by the master at the custom-house on his departure, there is no item of flour. But in that manifest there is this item: "Forty-six barrels sundries. marked 'J. P. Jr.,' shipper, John Page, Jr., Hallowell." Now, whatever these barrels of sundries were, they were not flour of Page's shipment, or purchase, at Boston. There is no proof of any flour being purchased in Boston for Page, and shipped on board the Magnolia. There were thirty-four barrels of flour purchased by Capt. Davis at New York. There is the testimony of a Hallowell witness, Nathan W. Butler, (not of the crew,) who says, that he was in Boston in the autumn of 1832, when the Boston was lying on the south side of Long-wharf, having been a few days before brought in by the Magnolia. While the Boston was lying there, he saw some barrels of flour taken from her, and rolled across the wharf, and put on board the Magnolia. How many barrels he cannot say; but Capt. Davis, of the Magnolia, told him, that he was going to bring his part of the flour, that was found on board of the Boston, to Hallowell. The corn, he said, he should not bring from Boston, but let it be sold at auction, as that was some damaged. This conversation was had, while the flour was discharging from the Boston. Now, in point of fact, Capt. Davis was not a purchaser of any of the flour of the Boston at the auction, as appears by the auctioneer's account, now before the court, and no satisfactory explana-

tion whatever is given of this conversation. Capt. Davis admits the possession of ten barrels, part of the Boston's cargo, and that he carried them to Hallowell in the Magnolia, (though there is no specification of them in his manifest,) and sold them there; and he asserts, that he purchased them of a person in Boston by the name of Ricketson, whom he never saw before, from whom he took a bill and receipt, on paying him for the flour; and that he has never seen him since. He apeared to be a merchant of respectability, and very much of a gentleman. Now, on inspection of the auctioneer's account, no person of the name of Ricketson appears as a purchaser; and it is admitted at the bar, on both sides, that, after a diligent search, no person by that name, or any other name, can be found in Boston, to whom the purchase or sale of these ten barrels can be traced. It seems to me, that these circumstances are abundantly fruitful of well founded suspicion against the bona fides of the title to these ten barrels of flour. Nor does the testimony of John Davis, the witness, by any means relieve the case from the just weight of these suspicions. In support of the master's case, he states, "I was at work on Long-wharf, while the schooner Boston was discharged. I went up to Capt. Davis, who was talking with a gentleman. I was going to ask him, what I should do with the basket, with which I had been discharging the Boston's corn. I heard the gentleman say, 'You had better take fifty barrels.' Capt. Davis said, he was short of money, and had been at considerable expense; you may send me down ten barrels, as soon as you are a mind to. The gentleman asked, 'Where does your vessel lay?' he says, 'Right opposite here, on the back side of the wharf,' and turned round and pointed towards where the vessel lay." Now, without stopping to consider, whether, as mere hearsay, the objection made to this testimony is not well founded, but admitting its full force, it presents a very extraordinary state of facts. That a gentleman, unknown to all parties, should be trafficking with the master for fifty barrels of flour, without any known place or store, where he or they were to be found; that this flour, or any part of it, should be of the Boston's cargo; that the master should purchase the ten barrels, without further inquiry; and that no trace can now be found of the gentleman, or of any purchase of any of the Boston's cargo by him; these are circumstances somewhat startling, and cast an air of improbability over the asserted transaction. When we connect it with Butler's testimony, which is left wholly unexplained and unrepelled, that improbability is certainly a good deal enhanced. The court cannot but feel, that the master is bound to give some more satisfactory account of his purchase. Why was not this flour stated in the manifest at Boston, when all the rest of the cargo was?

Even the learned counsel, who has argued with so much zeal and ability for the master, has been compelled to admit, that this part of the case is not beyond suspicion. He says, that Ricketson may have become subpurchaser after the sale, although it cannot be traced; or, that he may have been a thief, and have been credulously bargained with by the master. But, how should the flour have been stolen, if the master at or before the unlading had exerted the vigilance, which he has so strongly asserted? A theft after the sale cannot be pretended; for no purchaser has attempted to set up any deficit in his own purchase or delivery; and none is now relied on.

But the master admits that he took a bill and receipt for the purchase from Ricketson. Where is that paper? The counsel for the master are obliged to contend, that it has never been produced. We shall presently see, if this be correct. If not produced, why is it withheld? The very suppression of it is calculated to aggravate every suspicion. If produced, it might enable us to trace the verity of the transaction; for handwriting often affords a satisfactory clue. Does not its non-production, then, imply, that it will not bear scrutiny? that it will not mitigate the imputation of guilt, but deepen it? But, in point of fact, how stands the case, as to the bill and receipt? It is proved in the case, that the counsel for Capt. Davis produced, and delivered to the counsel for the claimants, an original paper, purporting to be the very bill and receipt, and with no intimation of any doubt of its genuineness, or of their not intending to use it, as evidence in the case. On the contrary, it is an irresistible inference, that it was relied upon as genuine, and if so, as most important evidence in the case. That paper, after an exact and literal copy was taken, (which is now in court,) was re-delivered to the counsel of the master; and has been since traced home to the hands of the master. Nay, after its existence and production had become a most material point in controversy in the case, and when the person, in whose hands it was, was about to be examined as a witness, to produce and annex it to his testimony, Capt. Davis deliberately received it from the witness, and destroyed it. No explanation has been given, or attempted, of this act; and it, therefore, stands in the case, as a deliberate suppression of a paper of singular importance in the cause; if genuine, to the interest of the master; if otherwise, of much strength of presumption of fraudulent misconduct. But it has been said, that there is no evidence, that the paper originally came from, or was accepted as genuine by, Capt. Davis. It may be far more correctly said, that there is no evidence, that he has ever repudiated it, or disavowed it. It is found in possession of his counsel, as a document in or for the cause. How it was obtained by them is not satisfac-

torily shown. As far as any evidence goes, it is probably traced through and from his attorney at New York. Nay, to this very hour, Capt. Davis does not pretend, that he ever disavowed its genuineness to his counsel, or that it did not come to them by his direction or consent. The claimants could not examine them to this point. Capt. Davis was at liberty so to do; and has not chosen to do it. Nay; looking to the evidence in the case of the existence of the paper, and its destruction by Capt. Davis, his very silence is as expressive, as the most positive declaration, that he had not treated it as a spurious document. It has been said, that it might have been forged by persons in the adverse interest at New York, to give a complexion to the cause. Surely, the court cannot be expected to act upon such a naked conjecture, without even the shadow of any proof in its favor, positively or negatively. The bill and receipt must then be considered, through the instrumentality of the copy, to be clearly in the case, offered as a genuine voucher by Capt. Davis. It is in the following words: "Boston, November 14th, 1832. Capt. Davis, Dr. To F. Ricthrson, for ten barrels Flour, partly damaged, at four dollars and three quarters per barrel, $47.50. Received payment, F. Ricthson." Now, it seems difficult to escape the impression, that the paper itself is a spurious contrivance by some person. The supposed name of the seller is spelt in one place "Ricthrson," and in another "Ricthson." The date is the 14th day of November, 1832; the sale of the Boston's cargo was more than a month before (on the 6th of October): the Magnolia cleared out from Boston for Hallowell on the 25th of October; and the master has testified, that he was in Hallowell on the 14th of November. Yet if the representations of the master or mate are to be credited, the bill and receipt were given on board of the Magnolia, while she lay in Boston. If, under these circumstances, the court would come to the conclusion, that Capt. Davis had established a bona fide purchase of these ten barrels of flour, it would be by an exercise of compassionate credulity beyond any to be found in judicial annals. With whatever reluctance, the court is compelled to say, that there is a total failure to establish it.

Hitherto, the case has been considered upon the evidence arising aliunde the ship's crew; and, on the part of the claimants, at least, upon evidence entirely free from the suggestion of any discredit. But the positive evidence of the three seamen of the Magnolia, (Hanson, Thorn, and Clarke,) goes directly to establish a studied embezzlement by the master, with the connivance and aid of the mate, of the rigging and other ship's furniture, charged by the claimants. If it stopped here, (although the full consideration of the bearing of this evidence properly belongs to another part of the cause,) it would go far to support the embezzlement of the flour also; for the maxim may here properly apply, under such circumstances, Falsus in uno, falsus in omnibus; he, who would embezzle the former, would not hesitate as to the latter. But the witnesses speak to the flour also. Hanson says, that one morning, just at break of day,—the morning when the Boston was discharged,—he saw a dray coming from Long-wharf to the T-wharf, (where the Magnolia lay,) with ten barrels of flour; they were carried opposite the Magnolia, and the mate of the Magnolia gave orders to strike them directly into the hold. He assisted in doing so. He knew they were part of the Boston's cargo, because they were wet, and corn and feathers were sticking to them. The mate said, they were part of the Boston's cargo. Thorn is still more direct and particular on the same point. Clarke is equally positive and direct. Now, if these witnesses are to be believed, there is on this point an end of the case. The embezzlement is established beyond controversy. Some attempt has been made to discredit the testimony of these witnesses; but not, I think, with success. They are materially confirmed in some circumstances, as to the rigging, &c., by Mr. Bergen, who is a New York broker, and was employed to examine into this very matter of the embezzlement, when the Magnolia at a subsequent period, (in December, 1832,) was again at New York. He then went on board of the Magnolia, in company with Thorn and Hanson, and Carpenter, a seaman of the Boston, and found Clarke on board, and the mate Kateng. He says, that Carpenter there pointed out, then on board of the Magnolia, the boom-tackle and watch-tackle of the Boston; and the mate admitted the fact. Carpenter also pointed out a wood-saw, hand-pump, draw-bucket, an axe, and some rigging, belonging to her. He adds, that the mate, after some hesitation, admitted the facts; and also admitted, that some of the Boston's flour, (ten or eleven barrels,) was taken on board of the Magnolia; and endeavoured to excuse himself. Now, the mate stoutly denies the whole of this evidence; and certainly, so far as it is founded in hearsay, it cannot affect Capt. Davis; but as to the mate, it bears directly upon his own claim. Mr. Bergen's testimony is assailed, as incredible in itself, and as contradicted by other testimony. He certainly is contradicted by Kateng, the mate, and by Theodore Blackburn, a boy then belonging to the Magnolia. The testimony of the former is already disposed of. The testimony of the latter is open to attack, as disingenuous and suppressive of proper answers to some of the interrogatories; and has been assailed on other grounds. It is wholly unnecessary to consider these objections, because my judgment is, that Bergen's testimony is credible in itself, and is amply corroborated from other sources.

Upon the whole, without going farther into

this part of the case, my judgment is, that the case of embezzlement of the flour is fully made out; and it equally affects the claim of master and the mate. As to the embezzlement of the anchor, and rigging, and other furniture of the Boston, I shall be very brief. It is admitted, that many of the articles were taken on board of the Magnolia, and carried to Hallowell. And the defence asserted is, that it was a case of sheer mistake, and corrected as soon as discovered. This is true to some extent: and it is quite possible, that the change of the anchor of the Boston for that of the Magnolia may have been by mere mistake. But it was not returned; and as to the boom-tackle, and watch-tackle, and other articles. found at New York, on board of the Magnolia, the defence is not completely established. It is manifest, that a good deal of the appropriate equipments and furniture of the Boston disappeared after her disaster. If the testimony of the three seamen is to be believed, there is (as has been already stated) unequivocal evidence of a meditated embezzlement of many of these articles. If the other part of the transaction had been free from all doubt, there might have been some scope for an indulgent consideration of this part of the case, upon the ground of negligence, or ignorance, or mistake. As the actual posture of the case is, it seems to me, that the taint of embezzlement has infected the whole transaction to an extent fatal to the claim of salvage. I regret that I am compelled to arrive at this painful conclusion; but looking to all the circumstances, I am unable to escape from it.

My judgment accordingly is, that the decree of the district court, as to the amount of the salvage, ought to be affirmed. As to the distribution of the salvage, there being no appeal, whatever might otherwise be my opinion, I do not feel at liberty to disturb it. But, I do decree, that the shares of Capt. Davis, both as part owner and as master, in the salvage, be decreed forfeit to the owners of the Boston and cargo; and also, that the share of the mate, Kateng, be in like manner decreed forfeit. In all other respects, the decree of the district court is to be affirmed; and, under all the circumstances of the case, I shall direct the costs of all parties, libellants and claimants, in this court, to be a charge upon the property saved, and to be deducted therefrom accordingly. Each party here has prevailed to a certain extent, and therefore may well claim some indemnity; and the master and mate have been sufficiently punished by the forfeiture of salvage, without attempting to press upon them any separable item of the costs. I shall refer it to the clerk, to ascertain and report what sums are due to the salvors respectively, according to the principles of this decree, and the amount of the shares of the master and mate, which are decreed to be forfeited. Decree accordingly.