## Case No. 637.

### The ATTACAPAS.

[3 Ware, 65.] [1]

District Court, D. Massachusetts. 1856.

SALVAGE—DERELICT—PRINCIPLES UPON WHICH SALVAGE IS ALLOWED.

1. Any vessel is not derelict until abandoned by the master, without an intention of returning and resuming the possession.

2. Principles on which salvage is allowed. Twelve hundred dollars given under the circumstances of this case.

In admiralty.

Mr. Jewett, for libellants.
Mr. Prince, for claimants.

WARE, District Judge. The Attacapas, a brig of about 149 tons burthen, sailed from Port Haven, on the North river, with a ship's company in all of five hands, on the 17th of November last, having a cargo of 238 tons of coal, bound for Bangor. Her ground tackle was good but her running rigging was indifferent, though thought to be sufficient for the voyage. On her passage down the river and through the sound, she met with a good deal of bad weather and leaked badly, requiring to be pumped once in half an hour, when the sea was rough, and once an hour in favorable weather. She stopped several times on her way, and in running down Cape Cod she came to anchor off Newcombe Hollow, in about three fathom water, Nov. 24, at about 8 o'clock A. M., the wind then blowing a gale. Another vessel at the time was lying near her, but, under the pressure of the gale, soon dragged her anchors and went to sea. The crew went below to breakfast, but soon finding the vessel drifting they let go another anchor. The condition of the vessel was now undoubtedly one of great danger. She was so deeply laden that in a smooth sea the water was within three or four inches of the level of her deck, and in rough weather it constantly washed over. In the high waves she was in danger of striking the bottom where she lay, and her position was so near the outer sand bar, that the heavy ground swell might have carried her upon it with the wind, as it was off shore, and if it should haul out she would be very sure to ground on the bar. The master finding his peril, lying as he did on a treacherous coast, determined to weigh anchor and proceed to sea, but such was the strength of the gale, that the crew were unable to raise their anchors. It was then determined, for the safety of all, after putting the brig in the best condition to ride out the gale, to leave for the shore. The crew took out their clothes, bedding, and some other articles, and trusted themselves to the boat. In passing through the breakers the boat capsized and was destroyed, but the crew escaped to land, the mate badly wounded and two of the men slightly. Their

clothing drifted on the beach. This was between ten and eleven o'clock, and by this time, it being known that a vessel was lying off in distress, the salvors and a number of other persons were collected on the shore. Two of the salvors, Rich and Swett, took the master and crew to their house, gave them a dinner and furnished them with dry clothing. After dinner and again in the evening, the master and crew with some of the salvors, and at twelve o'clock, Rich, Swett, and some others without the crew, went to the beach, but such was the state of the weather that it was not safe to attempt to board the brig. From this time the evidence becomes contradictory, and, to a considerable extent, irreconcilably so. Without going into a critical analysis of the great volume of testimony, and without entering on a fruitless attempt to conciliate what is irreconcilable, or undertaking the invidious office of comparing and deciding on the credibility of conflicting statements, I will give what appears to me to be the fair result of the whole evidence.

The salvors with the master and crew assembled on the beach early Sunday morning, and the wind had now so much moderated that it was determined to board the vessel in a whale boat belonging to Rich. Rich took the command, and the boat being prepared, six persons, as many as it was supposed could safely go in her, and among whom was Capt. Haskell, were arranged in their places ready for a favorable opportunity to pass the breakers. The orders were to jump in when the word was given. At that moment Capt. Haskell's attention was diverted to some person on shore, and as the launching of the boat was the work of an instant, he was left behind. But, after they had passed the breakers, Rich hailed Haskell and offered to go back in the boat and take him, but the noise of the water prevented his being heard. After boarding and examining the vessel Swett was left on board, and Rich, with the rest of the boat's crew, returned to the beach. At this time there were from fifteen to twenty persons, including the crew, present. Rich now proposed to return with a company of eight men and attempt to save the brig, but he said that having boarded her he should not give up his claim to salvage. The crew all declined, and of the whole company present only four volunteered to engage in the enterprise. Capt. Haskell, finding his crew failed him, now told Rich that he might take the vessel and do the best he could. He returned with four men who, with himself and Swett, six in all, with a good deal of hard labor, attended beyond doubt with considerable danger, after being prevented, by a change of the wind, from making Province Town harbor, navigated the ship to Boston and immediately gave notice to the owners in Salem.

The libellants claim salvage as for a der-

[1] [Reported by George F. Emery, Esq.]

elict, but the vessel, I think, cannot ·be considered as a derelict in the strict and proper sense of the word. The master never abandoned the spem recuperandi until, his crew failing him, he consented to transfer his authority to Rich. The claimants, on the contrary, deny all right ·to salvage on the ground that the master was wrongfully dispossessed by the salvors, and that they obtained possession by a tort, not to say a crime. This ground of defence is entirely displaced by the evidence. The salvors, in my opinion, performed a highly meritorious service, and there was nothing in their conduct that should debar them from a fair reward. What that is, must be determined by all the circumstances of the case taken in connection with the principles on which courts award salvage. As the vessel lay Sunday morning, with the wind as it then was, leaking badly and the water ankle deep on deck, she had but a small chance of surviving the day without relief, and as the wind veered around in the course of the day, it seems to be all but a certainty that she would be lost on the bar. The crew refused to go on board unless a new boat was obtained for the vessel. None could be obtained nearer than Wellfleet, and it was far from certain that one could be had there ready for the use of the vessel before the next day. Such appears to me to be the real state of the case as well as I can infer it from the great mass of testimony, often contradictory, and mostly coming from witnesses on both sides under influences that more or less sway the minds of most men, but some of it from disinterested and unsuspected sources. That anything was saved for the owners, appears to me with a high degree of probability, was due to the salvors. That the attempt to save the vessel appeared at the time to be an enterprise of very considerable danger and hardship, I think, may be safely inferred from this, that out of about twenty persons present, all accustomed to the sea, only four could be induced, by the prospect of a salvage reward, to engage in the undertaking. The service, though laborious and hazardous, was not of long duration. They started from Newcombe Hollow in the morning and arrived at Boston the following night. The vessel was without provisions, and the personal expense of the salvors must have been something, and to these should be added the expenses of vindicating their claim, which has been strenuously resisted from the beginning. And a line of defense has been adopted by the claimants, which has not only led to expensive and protracted litigation, more than a week having been consumed at the hearing; but which, if sustained, would have seriously compromised the character of the salvors.

The general principle which governs courts of admiralty in awarding salvage is to give a liberal reward, not merely a compensation pro opere et labore, but such a reward as will be an inducement to men accustomed to the dangers of the sea, to adventure on these perilous enterprises, by which not only property but often lives are saved. For saving life, at whatever risk, the courts can give no reward, for there is no common measure between life and money; but the merit of saving property may be measured by a pecuniary compensation. Another reason for liberality is to make the compensation such as will in some measure guarantee the honesty of the salvors, so that they shall not be tempted to pay themselves by the embezzlement of property left without protection; and farther, to ensure the good faith of salvors, embezzlement is always visited with the entire forfeiture of salvage. There is not, indeed, much danger of embezzlement of a cargo like this. But if I do not misjudge, there is another consideration belonging to this case that ought not to be overlooked. This vessel was rescued from the perilous shores of Cape Cod, a coast as much dreaded by mariners as the infames scopulos Acroceraunia of antiquity. For the interests of humanity as well as those of commerce, it is certainly desirable that the inhabitants of such a coast should understand, that if they will hazard their lives in relieving vessels in distress, they will not be dismissed with a parsimonious reward, such as will the next time put them to a calculation of the relative value of a gallant and hazardous salvage and the plunderings of a wreck.

There is, in all cases, a difficulty in holding the scales exactly even in salvage, and this is increased when it occurs on a dangerous coast where frequent losses happen, and where the inhabitants calculate to gain part of their living by acting as salvors of vessels in distress. They engage in the service for profit, and the roughness and dangers incident to the service, contribute to give them, together with the expectation of a reward, somewhat of a mercenary character, as well as one of gallantry. Habit comes in to make them put a low estimate on the personal dangers, both of the crew and themselves, compared with the expected reward. But they never forget that, and the owners, though they might be generous when the danger is before them, when it is passed and their goods are saved, remember that what is saved after salvage is paid is saved for them.

The value of the vessel and freight are agreed to be $3,500, and, with these views, I have come to the conclusion to allow $1,200 salvage, with costs taxed against the residue of the vessel and cargo. The salvage is divided into fifteen shares and to be distributed as follows: To Capt. Rich, who was the leader of the enterprise, and furnished his boat for the service, four shares; to Capt. Swett, who was the first that boarded the vessel in the morning, three shares; and to the other salvors, two shares each.