THE BARQUE ISLAND CITY—*Pierce et al., Claimants; Cromwell et al., Libellants.*

1. Parties who find a vessel derelict at sea, and carry her into port, are entitled to the usual salvage, without regard to meritorious but unsuccessful efforts previously made to rescue her by other parties.

2. To constitute a case of derelict it is not sufficient that the crew have left temporarily to procure assistance; the abandonment must be final, without hope of recovery or intention to return.

3. A ship disabled at sea is partially aided by one vessel, further assisted by another, then left with nobody on board, at anchor, but still in peril, while better means of rescue are sought for, and in that condition she is discovered by a third vessel, which brings her into a safe port:—this is a case in which all three of the vessels are entitled to share in the salvage awarded.

4. A right to compensation for salvage presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach or under the control of the salvors.

5. If salvors are guilty of embezzlement, whether at sea or in port, or even after the property has been delivered into the custody of the law, their claim for salvage is forfeited to the owners.

6. The operation of this rule does not depend on the amount or value of the property embezzled; the law visits any embezzlement, though small, with an entire forfeiture of all claim for salvage.

7. When the embezzlement is secret and purely an individual act, it will not prejudice co-salvors, who are innocent and ignorant of it; but all are guilty who consent to, connive at, or conceal it; who encourage it, or fail to prevent it when they can.

This was a libel for salvage by H. B. Cromwell and others, owners of the steamer Westernport, against the barque Island

City. The libel was filed in the District Court of the United States for Massachusetts, and was removed into the Circuit Court on the certificate of the district judge that he was in terested.

In January, 1857, the *Island City*, on her voyage from Galveston to Boston, made Cape Cod in a snow-storm. The master finding he could not get by the cape, anchored in Vineyard Sound; but finding his ground tackle would not hold, he cut away the masts, and brought up near the Horseshoe. The schooner *Kensington* went out from Hyannis to her assistance, but, after every effort, was not able to get her into port. The Kensington towed her some distance, but finally left her anchored in four and a half fathoms of water, with a hundred fathoms of chain out, dismasted, and without a rudder. The owners of the Island City being informed of her situation, requested the master of the steamer *R. B. Forbes* to go to her aid. He did so, and found her where the Kensington had left her, and in the helpless condition mentioned. The steamer took the barque in tow on Saturday, the 24th of January, with the intention of carrying her into Boston. The severity of the weather and the floating ice made this a work of great labor, hardship, and peril. On Monday, the steamer's coal being found insufficient, she took off the crew of the barque, left her at anchor off Great Point, Nantucket Island, without any person on board, and went to Provincetown for a supply of coal. Several accidents delayed the steamer in getting the necessary quantity and quality of coal, and it was not until the Saturday afterwards that she was able to return to the place where she had left the Island City at anchor. She was not there. The steamer *Westernport* had discovered her the day before the return of the Forbes, got up her anchor, took her in tow, and brought her into Hyannis, where she was followed by the Forbes and brought to Boston.

While the Island City was in possession of the Westernport the officers and crew of the latter vessel broke open the chests of the master and seamen of the barque, robbed them of their clothes, watches, and money, carried away the quadrant and barometers of the ship, rifled trunks on freight; and this pil

lage was committed extensively and upon a plan of general plunder, by the mate and many of the seamen, without opposition from any of them. When complaint was made, some of the articles taken were restored to their owners, but a consid erable portion of the money and clothing was never returned.

The owners of the schooner Kensington, of the steamer R. B. Forbes, and of the steamer Westernport, all filed libels against the Island City for salvage, and the three cases were heard together.

Mr. Justice *Clifford*, in the Circuit Court, gave his opinion at length, and decreed that the whole amount of all the salvage services rendered by all the libellants in the three cases was $13,000, of which $3,300 were rendered by the Kensington, $5,200 by the Forbes, and $4,500 by the Westernport. One-third of the last mentioned sum was decreed to the owners of the Westernport, but the other two-thirds, (viz: $3,000,) to which the master, officers, and crew of the Westernport would otherwise have been entitled, were adjudged to be forfeited to the owners of the Island City, by reason of the misconduct of the said master, officers, and crew of the Westernport, and, so far as they were concerned, the libel was dismissed. From this decree the owners of the Westernport took the present appeal. The other parties submitted to the decree of the Circuit Court.

*Mr. Dana*, of Massachusetts, for libellants. There must be three elements in every case of salvage: 1st, a marine peril; 2d, voluntary service upon contingent compensation; 3d, full and entire success.

The services rendered by the crew of the Kensington had the two first of these elements, but wanted the last. They failed of success; they left the barque from necessity, and abandoned her to her chances, instead of taking her to a place of safety where she could have been delivered to her owners. The service being short of entire success, the merit of it is immaterial. The court will not inquire whether the ultimate safety of the vessel was made more or less probable by the

service rendered, nor speculate upon the comparative degrees of her peril in the places where she was found and where she was left.  It must be a case of salvage, or it is nothing.

The Forbes makes a claim for nothing but contract services, to be paid on a *quantum meruit*.  Her case, therefore, has not in it the necessary ingredient of voluntary service upon contingent compensation.  She was engaged by the owners of the barque, was in their service, and subject to their order.  Her employment was liable to be terminated at the pleasure of the owners of the barque.  She could not, like a salvor, insist upon retaining possession.  No question can arise between the Forbes and the real salvors.  If the Forbes is entitled to compensation for contract services, it is independent of, and subject to salvage.  After all the salvage awards are given, her claim may be heard.

Of all the three vessels that went to the aid of the Island City, the Westernport was the only one whose service was salvage in its nature.  It had all the elements of salvage; for, 1st, the Island City was in peril; 2d, the service of the Westernport was voluntary; and, 3d, it was completely successful.

At the time when the Island City was taken possession of by the Westernport the latter vessel was not in the possession, actual or constructive, of her own crew, or of any salvor.  She was derelict in the true sense of the law of salvage.  She lay in an open sea, held by an insufficient anchor, surrounded by shoals, dismasted, without a rudder, and with no one on board.  She was deserted, abandoned, forsaken.  In our law, the word *derelict* has not the intense signification which it bore in the civil law. . It does not mean that the owner has renounced title, but merely that the thing has been deserted, though it may be with the hope of returning.  The test is not the *hope* but the *power* of resuming possession.  In the case of a derelict vessel the title remains in the owner, with a temporary right of occupancy for salvage in the finder.  It is doubtful if the crew of this vessel could have been compelled to return.  Their ability to do so certainly depended on the weather, and every circumstance that increased the peril of the barque made

their return less probable. *The Amethyst*, (Davies, 21;) *The John Gilpin*, (Olcott, 78;) *The John Wurtz*, (Olcott, 470;) *Rowe vs.* ——— *Brig*, (1 Mason, 373;) Swabez's Adm., Rep. 205.

The rule in cases like this is to give one-half for salvage, making an equitable division between owner and salvor; *The John Wurtz*, (Olcott, 470;) and though it be true that the rule is artificial and flexible, yet it *is* a rule, and must be adhered to, unless reasons be shown for departing from it. *The Henry Ewbank*, (1 Sumner, 411.) The rule of giving one-half to the salvors was followed in the cases of *Rowe vs.* ——— *Brig*, (1 Mason, 373;) *The Henry Ewbank*, (1 Sumner, 400;) *The Boston*, (1 Sumner, 328;) *Sprague vs. Barrels Flour*, (2 Story, 195;) *The Galaxy*, (1 Bl. & Howl., 270;) *John Wurtz*, (Olcott, 460;) *L'Esperence*, (1 Dods., 64;) *The Frances Mary*, (2 Hagg., 89;) *The Elliotta*, (2 Dods., 75;) *The Reliance*, (2 Hagg., 90;) *The Eugene*, (3 Hagg., 156;) *The Effort*, (3 Hagg., 153;) *Zwei Gebroder*, (3 Hagg., 430;) *The Galt*, (2 W. R., 70;) *The Nicolina*, (2 W. R., 175;) *The Britannia*, (3 Hagg., 153.) And where one-half is given, the expenses of the salvors are sometimes taken out of the other half. *The Frances Mary*, (2 Hagg., 90;) *The Reliance*, (ib. in note.) In some cases one-third is given, and in some more than one-half, as in *The Waterloo*, (1 Bl. & H., 128;) *The Cora*, (4 Wash., 80;) *The Charles*, (Newb., 329;) *The Thetis*, (2 Knapp, Pr. C., 410;) *The Yonge Bastiaan*, (5 Rob., 287;) *The Jubilee*, (3 Hagg., 43;) *The Rising Sun*, (Ware, 385.) In England, the rule not to exceed one-half is not applied to cases of derelicts. *The Inca*, (Swabez's Adm. Rep., 371.) In this case all the circumstances combine to make the resort to a high rule of salvage proper and just. The reasons for giving a liberal allowance are well stated in the cases of *The Nath. Hooper*, (3 Sumner, 579;) *The Boston*, (1 Sumner, 323;) *The Hy. Ewbank*, (1 Sumner, 424–5–6, 429;) *The Missouri's Cargo*, (Sprague's Dec., 268–71;) *The John Gilpin*, (Olcott, 88;) *The Spirit of the Age*, (Swabez's Ad. R., 286;) *Barrels of Oil*, (Sprague's Dec., 93.)

As to the alleged misconduct of the salvors, the articles of clothing which were taken from the Island City by the men of the Westernport were taken and used to protect them

against the severity of the weather, and the other articles were taken on board the Westernport for safe keeping. The men intended to return, and did return, the articles taken; and if any articles were not returned, it was by accident or negligence. There was no intention of any one belonging on board the Westernport to steal or embezzle any article.

*Mr. Curtis*, of Massachusetts, for claimants. The vessel was not derelict, because the crew left her to obtain coal and provisions, and with intent to return. *The Aguila*, (1 C. Rob., 37;) *Taylor* vs. *Pryor*, (1 Gal. R., 133;) *The Emulous*, (1 Sum., 209;) *The Bee*, (Ware's R., 345;) *The Dodge*, (Healey, 4 Wash., 651.) To entitle a party to salvage, not only must the service rendered be meritorious, but the *possession taken* must be lawful. *The Amelia*, (1 Cranch, 1;) *The Dodge*, (Healey, 4 Wash., 651;) *The Barefoot*, (1 Law and Eq., 661.) The *jus disponendi* which belongs to the owner is not interfered with by any principle of admiralty law; and if a vessel be found, though with no one on board, under such circumstances that the defenders knew, or ought to have known, their services were not desired, and they take possession, with intent to supplant the master and owners in giving her relief, they have no claim for compensation. *The Upnor*, (2 Hag., 3;) *The Barefoot*, (1 Law and Eq., 661;) *The India*, (1 W. Rob., 408;) *The Amethyst*, (Davies' R., 23.) The court is always jealous to maintain the rights of those who have begun a salvage enterprise, and are prosecuting it in good faith. New comers are not allowed to interpose and dispossess them for covetous and selfish ends. They must prove an absolute necessity for such interposition. *The Charlotte*, (2 Hag., 361;) *The Eugenie Bourne*, (3 Hag., 160;) *The Effort*, (3 Hag., 167–8;) *The Glasgow Packet*, (2 W. Rob., 306.)

But whatever salvage, if any, may have been earned by the master, officers, and crew of the Westernport was forfeited by embezzlement and by gross negligence in the custody and care of the property which came into their possession. The law is clear, that *any* embezzlement works a forfeiture. *The Blaireau*, (2 Cranch, 240;) *The Boston*, (1 Sum., 339;) *The*

*Rising Sun,* (Ware's R., 379.) Not only so, but the law demands of salvors what Júdge Story terms "*incorruptible vigilance,*" (1 Sum., 341-2;) and gross negligence, still more wilful carelessness, is cause of forfeiture. *The Duke of Manchester,* (2 W. Rob., 56, 471;) *The Barefoot,* (1 Law and Eq., 661;) *The Cape Packet,* (3 W. Rob., 122;) *The Glory,* (2 Law and Eq., 551.) Actual embezzlement of the most cruel kind, robbery of shipwrecked mariners, and extensive plunder of their effects, are clearly proved.

There was one complete salvage service performed by the successive efforts of the three vessels, and the Circuit Court properly allowed but one salvage compensation. That compensation ($13,000) was large and liberal. The distribution of it was discretionary, and should not be changed on appeal, unless it manifestly appears that some important error has been committed. *The Sybil,* (4 Wh., 98;) *Hobart* vs. *Drogan,* (10 Pet., 108.)

There is no error in the distribution of the amount allowed the Westernport. The same proportion (one-third) was allowed in the *Blaireau,* (2 Cranch, 240,) to the salving vessel *and cargo;* and that proportion has been adopted in many other cases. Mr. Justice Story says, in the case of the ship *Henry Ewbank and cargo,* (1 Sum., 426,) that one-third is the proportion habitually adopted, and to induce a departure from it very peculiar and pressing circumstances must be shown; and he refers to many cases in support of his position. In this case there are no such peculiar or pressing circumstances.

Mr. Justice GRIER. If the barque "Island City" was derelict when she was rescued by the Westernport, the libellant would be entitled to the usual allowance for salvage in such a case, without regard to previous unsuccessful attempts to rescue her by the Forbes and the schooner Kensington.

The owners of the barque have not appealed from the decision of the court on the libel filed by the other alleged salvors. But the decision of those cases may be collaterally challenged in this, in so far as they affect the rights of the libellant, if his vessel was entitled to the whole, and has received but one-third.

The first question, then, is, whether the salved barque was derelict, or totally abandoned by her crew and the others who claim to have commenced the salvage service, which, it is admitted, was successfully concluded by the Westernport.

When the barque was discovered by the Westernport, on the 30th of January, 1857, in Vineyard Sound, she was dismasted, and her rudder gone; she was held only by her stream anchor and a heavy chain. She was liable, in case of a storm of wind from the *east*, to be driven by the ice on shoals, and lost. The crew had left her thus apparently abandoned. The Westernport was, therefore, justified in taking possession of her, and taking her to a place of safety in the port of Hyannis, and to have a liberal salvage compensation, even if it should turn out that the barque had not been derelict.

To constitute a case of derelict, the abandonment must have been final, without hope of recovery, or intention to return. If the crew have left the ship temporarily, with intention to return after obtaining assistance, it is no abandonment, nor will the libellant be entitled to the salvage as of a derelict.

The testimony in this case fully justifies the decision of the court below, that when the barque was discovered by the Westernport she was not derelict.

The peril from which the barque was finally rescued by the interposition of the Westernport was begun previous to the 23d of January, when the barque was first discovered by the schooner, and the salvage service was first commenced. The barque was in her greatest peril at that point, and was with much difficulty taken by the schooner to a place of greater comparative safety; but she was unable to put the barque in a place of absolute safety in the port of Hyannis. The peril was not ended. The schooner being unable to complete the rescue, gave notice, by telegraph, to the owners at Boston, who despatched the steamer Forbes to the assistance of the barque.

The Forbes then takes possession of her, and, finding it impracticable, on account of the ice, to take her into the port of Hyannis, attempts to take her to Provincetown. After encountering much peril and difficulty from the tides and the ice, it is discovered that their supply of fuel is insufficient,

under the circumstances, to take themselves, with the barque in tow, to Provincetown. They then conclude to anchor the barque, with her remaining anchor and heavy chains, in a position of greater comparative safety, where she would most probably be able, though not out of peril, to ride out the storm till the Forbes should return. The crew of the barque departed in the steamboat, intending to return, believing they could render more service by expediting her return, while they could be of no service by remaining on board the barque. They were detained at Provincetown much beyond their expectation, from the impossibility of sooner obtaining a supply of coal, and were unable to return till after the Westernport had taken possession of the boat, and brought her safely into the port of Hyannis. We concur, therefore, in the opinion of the Circuit Judge, that the barque was not abandoned after the salvage service commenced; that it was one continuous peril from which the barque was rescued, and that each of the several salvors contributed to the final result. The amount allowed for the salvage service was liberal, and the apportionment of it among the several salvors just and proper.

It has been contended *here*, that the court, in apportioning the salvage allowed to the Westernport as between the owners of the boat and the crew, should not have followed the established rule of giving but one-third to the ship, and two-thirds to the crew; that it is the power of steam, which is the chief agent in the rescue, and the danger, if any, is to the boat and cargo, and the enterprise and perils of the crew comparatively unimportant. We admit that there may be cases in which a court might be justified in not adhering ridgidly to the rule; but in this case, the question was not properly raised by the pleadings or evidence, so as to justify the court in departing from it. The evidence shows that considerable danger and hardship was encountered by the crew, and it is only after the court have adjudged their claim to have been forfeited by their misconduct, that fault has been found with the apportionment. In establishing a new rule as regards steamboats, the parties interested in the decision of the question, and claiming adverse interests, should both be heard, and a proper issue made be-

tween them, where the testimony taken should have direct reference to the issue to be decided. In this case the crew had no counsel to contest the question adversely to the boat.

Lastly, it has been contended, that the decree of the court, forfeiting the salvage apportioned to the crew on account of their misconduct, is unnecessarily harsh and severe, and ought to be reversed. The principles of law which should govern the case are correctly stated by the Circuit Judge in the following summary from adjudged cases :

"Public policy encourages the hardy and industrious mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation. Those liberal rules as to remuneration were adopted, and are administered not only as an inducement to the daring to embark in such enterprises, but to withdraw, as far as possible, every motive from the salvors to depredate upon the property of the unfortunate owner. While the law is thus liberal as to compensation, it requires on the part of the salvors the most scrupulous fidelity. It visits, says a learned judge, any embezzlement, although small, with an entire forfeiture of all claim for salvage. It not only withholds the extraordinary reward allowed to the honest salvor as a premium for his courage and hardihood, but, by way of penalty for his fraud, deprives him even of a *quantum meruit* for his labor. While the general interests of society require that the most powerful inducements should be held out to men to save life and property about to perish at sea, they also require that those inducements should likewise be held forth to a fair and upright conduct with regard to the objects preserved. Compensation for salvage service presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach or under the control of the salvors. Salvors are required by the nature of their undertaking, and by a due consideration of the large award allowed them for their services, to be vigilant in preventing, detecting, and exposing every act of plunder upon the property saved; and if they are guilty of

*The Island City.*

embezzlement, whether at sea, in port, or even after the property is delivered into the custody of the law, it works a forfeiture of their claim to salvage. When secret, and purely an individual act, it is justly held not to prejudice co-salvors, who are innocent. But all may become guilty by consenting thereto, or by connivance, concealment, or encouragement afforded to the actors, or by not preventing the act when it is in their power."

On a careful examination of the testimony, we concur with the court below in their application of these principles to the case before us.

The embezzlement proved was not the secret act of one or two of the crew. A general system of plunder seems to have been carried on while the barque lay at the wharf in Hyannis, and before the crew returned to claim their property. In this the officers and crew of the Westernport seem all to have been actively or passively implicated. Locks were broken, chests and trunks forced open, and clothing, money, and other articles of value were carried away, and never returned. Those who did not actively participate in this systematic and general pillage have connived and consented thereto, and have justly been decreed to have forfeited all right to compensation.

*Decree of the Circuit Court affirmed, with costs.*