## THE HYDERABAD.

*(District Court, E. D. Wisconsin.. January Term, 1882.)*

1. SALVAGE—DERELICT.

   Where a vessel was injured by a collision, and was thereby rendered so unsafe that the master, mate, and crew sought safety on the colliding vessel, leaving the injured vessel to drift helplessly on the sea, but intending to proceed to a port for the purpose of procuring a tug to rescue the wrecked vessel, and did actually procure a tug and returned to the wrecked vessel, it is not a case technically of legal derelict.

2. TOWAGE SERVICES—AS SALVAGE—RIGHT OF POSSESSION.

   Where a steam-barge sights a vessel at sea drifting helplessly and in great peril, with a hole stove in her port quarter, her wheel unshipped, all her head gear carried away, her sails torn, her boom and bowsprit hanging over her bow, and otherwise injured, and goes to her assistance and tows her to a port of safety, the finders of the wrecked vessel, having originally taken lawful possession of her, have the right as salvors to retain possession until their just demands shall be paid, or until the vessel shall be taken into the custody of the law preparatory to the amount of salvage being legally ascertained.

**3. Possession of Salved Vessel.**

    It is not permissible under such circumstances for the salvors to unreasonably exclude the master and crew of the wrecked vessel from all relation to and interest in the property should they return to her with means of her rescue.

**4. Salvage Compensation.**

    Where the risk incurred by the salving vessel, and the danger to which the property employed by the salvors in rescuing the wrecked vessel was exposed, were not extraordinary; the skill and labor employed in the rescue, though adequate, were not of singular character; the time occupied, the value of the property saved, and the value of the salving vessel were not great,—it is not a case of the highest order of perilous salvage service, so as to merit as compensation the moiety of the property saved.

*Finches, Lynde & Miller*, for libellants.

*Markham & Noyes*, for claimants.

Dyer, D. J. This is a cause of salvage. Two libels have been filed—one by the owner of the steam-barge Alpena, and the other by her master and crew, in which last-mentioned libel the master of the barge Wenona joins. The material facts are as follows:

On Monday, the seventh day of June, 1880, the Alpena, of which the libellant Bewick was owner and of which the libellant McGregor was master, having in tow the barge Wenona, of which the libellant Tucker was master, was on a voyage from Buffalo to Milwaukee, and at about 7 o'clock in the evening of that day, at a point in Lake Michigan south-west of south Manitou island and about ten or eleven miles off Pointe aux Becs Scie, the schooner Hyderabad was discovered in a disabled condition, with no one on board of her. The Alpena and her tow had arrived at North Manitou on the 6th, and on account of adverse weather had remained there under shelter until the afternoon of the 7th, when they resumed their voyage, sailing on a south-westerly course for Milwaukee. Both the Alpena and her tow were light. The testimony tends to show that the values of the Alpena and Wenona, respectively, were $40,000 and $18,000.

The Hyderabad had been in collision with the schooner Ford River. The former vessel had left Milwaukee on Friday evening, June 4th, laden with a cargo of about 19,800 bushels of wheat, bound for the port of Kingston. The Ford River was going to Chicago, loaded with posts, ties, and telegraph poles, and the collision occurred at about half past 4 o'clock on the morning of Sunday, June 6th.

Concerning the injuries sustained by the Hyderabad in the collision, one of the seaman on that vessel, sworn in behalf of the claimants, testifies: " The bowsprit, jib-boom, foretop-mast, main-gallant mizzen gaff, boat's davits, mainsail and the mizzen, were all injured or carried away by the collision. There was a hole in the port quarter just forward of the mizzen rigging; it was about eighteen inches to two feet in length, and about the breadth of one of her planks; the plank was broken and bulged in. This break was about three to four feet above the deep-load line. The water went from this hole into the kitchen, and from there it leaked down through the kitchen floor into the hold." The same witness says that the Ford River struck the Hy-

darabad on the port side of the stem, forward; that the hole in the Hyderabad's port quarter was made by the posts projecting over the rail of the Ford River; and that "when her bow swung off, that brought her stern in. Her head-stays and our head-stays got entangled. The motion of the vessels in the water, one rising and the other falling, caused the ends of the cedar posts projecting over the rail of the Ford River to strike the Hyderabad on her port quarter and thus made the hole." He says also that the Hyderabad's small-boat was broken, and that this was caused by the two vessels getting entangled and knocking the port davits away and pounding each other aft.

Another of the claimant's witnesses, speaking of the injuries to the Hyderabad, says: "Our bowsprit was carried away from outside the knight-head; our foretop-mast was carried away from the cap of the foremast head; and of the maintop-mast the gallant pole was carried away. Her foresail was torn; her mizzen was torn; her mainsail was torn a little; her rail was lifted up off the stanchions a little, forward on the port side. Aft, just forward of the mizzen rigging, on the port side, there was a plank bulged in; the wood all remained there. * * * The false covering board was started from the plank, about a foot in length and about an inch in the highest place, and then run off to nothing at either end. The oakum was not all out."

The master of the Hyderabad testifies that in the collision his vessel lost her bowsprit, jib-boom, head gear, foretop-mast, maintop gallant pole, and two jibs; that the mizzen boom was broken, and that the rail was started a little forward, and one stanchion was cracked; that on her port quarter the false covering board was started, and the plank between the covering board and the false covering board was stove in.

At the time of the collision there was a heavy sea running, and the master and crew of the Hyderabad, being fearful that their vessel would sink, went immediately on board the Ford River. That the Hyderabad was then supposed to be, and was, in fact, in sufficient jeopardy to cause great alarm, there can be no doubt. For a considerable time the Ford River remained near her, and before leaving her the master and mate of the Hyderabad and two of the crew of the Ford River attempted to board the Hyderabad, but the sea was so heavy that the small boat could not lie along-side the latter vessel with safety, and the attempt was abandoned. Wilson, one of the crew of the Ford River, testifies that at that time a tug could not have gone along-side the Hyderabad, and that sometimes as she rolled, her rail was under water. The testimony, however, tends to show that her hatches were then well secured and in good condition.

As all further effort to relieve the Hyderabad, in existing circumstances, was impracticable, the Ford River set sail for the west shore of the lake, taking with her the Hyderabad's entire crew. The Hyderabad was then standing head to the wind and sea, with her mainsail and staysail set, and various witnesses for the claimants testify that she appeared to be riding the seas easily, and without the appearance of being water-logged.

The Ford River left the Hyderabad about 2 o'clock in the afternoon of Sunday, June 6th, and arrived off Manitowoc about half past 7 o'clock on the following morning. It is very clearly shown that the purpose of the master of

the Hyderabad, and of the master of the Ford River, in sailing directly for the west shore of the lake was to reach a port where a tug could be obtained to go to the relief of the Hyderabad, and that this was the intention of the master and crew of that vessel when they left her. It is, of course, apparent that they went on board the Ford River, in the first instance, for greater personal safety, and that they did not, up to the time when the Ford River left, regard it safe to attempt to remain on the Hyderabad, nor could they be otherwise than doubtful whether she would survive her extremity; but it is clear that, when the Ford River left the scene of the disaster, the master of the Hyderabad had not abandoned the hope of reclaiming his vessel, and that his intention was to make every exertion in his power to save her. This is manifest from what followed, for on arrival at Manitowoc the masters of the two vessels went directly to the telegraph office and endeavored to engage a tug from Two Rivers for immediate service, and, on failing to accomplish this, a tug from Milwaukee was sent for, which at once responded to the call for assistance, and arrived at Manitowoc in the evening of that day. The tug remained at Manitowoc that night, and at about 3 o'clock on the morning of the 8th started, with the crew of the Hyderabad, on a north-east course, in pursuit of that vessel.

As before stated, the Alpena, while on her course to Milwaukee sighted the Hyderabad on the evening of Monday, the 7th, and nearly 30 hours had then elapsed from the time the Ford River had left the Hyderabad. The master of the Alpena testifies that when he found the wrecked vessel, her head gear, bowsprit, and jib-boom were carried away, and were hanging along-side of her; that her port side was in a broken-up condition, particularly above the plank sheer; "her fore-stay sail was set, foresail seemed to be hanging about decks, torn up, and in a very rough condition; mainsail was partly set, torn badly; mizzen sail in bad condition, boom carried away, small boats were gone. We afterwards found a hole in the port side. Her maintop-mast was carried away and was hanging down in the rigging. Did not see any one aboard of her when I reached her; she had evidently been abandoned, and her decks I could see from the pilot-house under water amidship. * * *. There was some sea running; she was rolling helplessly in the sea." This is the language of the witness.

The mate of the Alpena, testifying as to the condition of the Hyderabad, says: "Her wheel was unshipped; all her head gear carried away; her mainsail was all torn, her foresail was lying unfurled on deck, her jib-boom and bowsprit were hanging over her bow, her mizzen boom or gaff was broken, her maintop-mast was gone, hanging down; there was a break in her port-quarter, right under her covering board; I should judge the hole was in the neighborhood of two feet or eighteen inches long. * * * I think the hole was about the width of one plank; this hole was, I should judge, three feet, if she lay still, from the water."

There is other testimony on the part of the libellants as to the condition of the Hyderabad similar to that just referred to, and further showing that one of the vessel's pumps was out of working order.

The master of the Alpena ordered part of his crew to go aboard the Hyderabad and to take measures to rescue her. The master of the barge Wenona,

and some of her crew, also went on board. Certain precautions were taken for the escape of those who went on the Hyderabad in case their safety should be threatened by sudden danger. In the then state of the weather there was in fact no special peril in the undertaking, but in ignorance of the precise condition of the Hyderabad it was naturally feared she might suddenly sink. After ascertaining the extent of her injuries, and the condition of her cargo, the crew of the Alpena, aided by some of the crew of the Wenona, put her pumps in working order, covered the break on her port quarter with canvas, adjusted her steering gear as best they could, and then got out a line and took her in tow astern of the Wenona. It was quite a late hour in the evening when this was accomplished, and the vessels then proceeded on a course to Milwaukee, moving slowly and cautiously, as there was yet some fear that the Hyderabad might swamp or capsize.

While thus under way, between 8 and 9 o'clock on the morning of the 8th, the vessels were met by the tug which had left Manitowoc that morning with the master, mate, and crew of the Hyderabad on board. The tug came alongside the Hyderabad, and the mate and crew went aboard of her. The testimony tends to show that the master of the Hyderabad then informed the master of the Alpena that he was the chief officer of the former vessel, and had come with a tug to repossess her and take her in tow. The master of the Alpena declined to surrender possession, and asserted his claim as a salvor. Some further negotiations were attempted, in the course of which the master of the Hyderabad claims that he gave the master of the Alpena assurance that he should be adequately compensated for his services, but they were unavailing, and thereupon the tug returned to the Hyderabad, took from her a line, and thus all the vessels proceeded to Milwaukee, where they arrived at 10 o'clock in the evening of that day. From the time the master and crew of the Hyderabad returned to her, until their arrival in port, such joint control was exercised over the vessel by them, and by the master and crew of the Alpena, as manifested a purpose to assert on one hand the right of salvors, and on the other the right of original authority and possession, temporarily lost, but now reclaimed; and the same state of affairs continued, with reference to possession, after the vessel was brought into port and until the removal of her cargo, which was completed on the afternoon of Thursday, June 10th.

I do not find that the Alpena, in going to the relief of the Hyderabad, was obliged to materially deviate from her original course, and the testimony tends to show that she lost from 11 to 12 hours' time in rendering the service in question. There is serious dispute between the parties as to the peril the Hyderabad was in on account of water in her hold, and as to the extent of the injury to her cargo. The testimony does not show the precise proportions in bushels, of dry and wet wheat, but the witness Vance testifies that after the dry grain was taken out there remained in the vessel about 10,000 bushels of damaged wheat, as near as he could judge. The dry part of the cargo was sold for $9,016.87; the wet wheat was sold for $500; and

the vessel, in her damaged condition, was appraised at $8,050; so that the entire value of vessel and cargo, after arrival in port, may be said to have been $17,566.87.

It is contended in behalf of the libellants that the Hyderabad, when found by the Alpena, was in the full sense of the law, derelict. Sir Leoline Jenkins defined derelicts to be "Boats or other vessels forsaken or found on the seas without any person in them." Life of Sir Leoline Jenkins, vol. 1, p. 83. The case of the Hyderabad answered this description. Sir William Scott, in the case of *The Aquila*, 1 C. Rob. 41, said: "It is sufficient if there has been an abandonment at sea by the master and crew, without hope of recovery. I say without hope of recovery, because a mere quitting of the ship for the purpose of procuring assistance from shore, or with an intention of returning to her again, is not an abandonment." In *Rowe* v. *Brig*, 1 Mason, 373, Judge Story said that to constitute a derelict, in the sense of the maritime law, "it is sufficient that the thing is found deserted or abandoned upon the seas, whether it arose from accident or necessity or voluntary dereliction. Sir William Scott has declared that a legal derelict is properly where there has been an abandonment at sea by the master and crew without hope of recovery. With the view, for which the words 'without hope of recovery' are introduced, viz., to distinguish a temporary absence from a permanent abandonment, it might, perhaps, have been more accurate to have said an abandoment without an intention of return; since the *spes recuperandi* might exist, even though the abandonment were without such intention."

In *The Coromandel*, 1 Swab. 208, Dr. Lushington said: "A master and crew abandon a vessel for the safety of their lives; he does not contemplate returning to use his own exertions; but the master hardly ever abandons a vessel on the coast without the intention, if he can obtain assistance, to save his vessel. That does not take away from the legal character of derelict."

In the case of *The Bee*, Ware, 334, Judge Ware says: "When a a vessel is found at sea, deserted, and has been abandoned by the master and crew without the intention of returning and resuming the possession, she is in the sense of the law derelict."

In the case of *The Island City*, 1 Black, 128, it was held by the supreme court that "to constitute a case of derelict the abandonment must have been final, without hope of recovery or intention to return. If the crew have left the ship temporarily, with the intention to return

after obtaining assistance, it is no abandonment, nor will the libellant be entitled to salvage as of a derelict."

Thus it appears that within the definition laid down by some jurists the libellants are right in their contention as to the legal character of the Hyderabad when she was found by the Alpena, but within the rule stated in the case of *The Island City* it is doubtful whether she was strictly and technically derelict. But although the master of the Hyderabad may be said to have neither abandoned the *spes recuperandi*, nor to have renounced the *animus revertendi*, she was at least *quasi* derelict. In the language of Judge Betts, in the case of *The Gilpin*, Olcott, 78, "she was apparently abandoned, and if her crew might have been absent to procure assistance from other vessels and more force, their ability to return to the wreck, or the chance of affording any aid after the lapse of a few hours, must, *in the then condition of things*, have been most dubious contingencies."

That the Hyderabad was in grave peril after the collision is apparent. She was out of sight of land, and was at the mercy of the elements. She had been deserted nearly 30 hours when the Alpena came upon her. When an abandoned vessel is thus found floating at large on the high seas, there is, of course, the consideration that, so far as any beneficial property of the owner is concerned, it is in the utmost peril,—nearly as much so, when it happens to turn out tolerably seaworthy, as if it were in bad order, because in any event the chance of recovery must be slight. *The Howard*, 1 Low. 7. The libellants would have been guilty of a dereliction of duty, finding the Hyderabad, as they did, helplessly afloat on the lake, if they had not taken immediate measures for her relief. When property is found thus temporarily left to the mercy of the elements, whether from necessity or any other cause, though not finally anbandoned and legally derelict, and the finder takes possession of it with the *bona fide* intention of saving it for the owner, he will not be treated as a trespasser. On the contrary, if by his exertions he contributes materially to the preservation of the property, he will entitle himself to remuneration according to the merits of his services as a salvor. *The Bee, supra*. The relief of property from an impending peril of the sea by the voluntary exertions of those who are under no legal obligation to render assistance, and the consequent ultimate safety of the property, constitute a case of salvage. It may be a case of more or less merit, according to the degree of peril in which the property was, and the danger and difficulty of relieving it. But these circumstances

affect the degree of the service, not its nature. *Williamson* v. *The Brig Alphonso and Cargo*, 1 Curt. 378.

The service rendered by the libellants, or some of them, was, then, a salvage service, and the remaining question is, what compensation should be awarded? As was said by the court in the case of *The Gilpin, supra*, I do not think this is a case for extravagant compensation. Although the services were well-timed, faithful, and highly meritorious, and outrank a mere *quantum meruit* reward, yet they are not entitled to be placed in the highest order of perilous salvage services. The risk incurred by the libellants, and the danger to which the property employed by them in rescuing the Hyderabad was exposed, were not extraordinary. The skill shown in rendering the service, and the labor performed, were adequate, but not of singular character. The time occupied, the value of the property saved, and the value of the libellants' vessels, have been stated. The more difficult question is, what was the degree of danger to which the Hyderabad was exposed when she was found and taken in tow by the Alpena? That she was in serious peril immediately after the collision, and that any vessel, left as she was to drift at large, subject only to the uncertain elements, is in great danger, is apparent. I am satisfied from the testimony, and from personal examination of the vessel made after the arguments, that the water found in her hold obtained ingress through the break in her port quarter. At the time of the collision and for some time after a heavy sea was running, and the break was not so far above the deep-load line as to be beyond the reach of the waves as the vessel rolled. The testimony on the part of the claimants tends to show that within a few hours after the Ford River left the Hyderabad the wind changed and became light, and the seas run down; and the testimony of the libellants is to the effect that when they sighted the Hyderabad the sea had taken the form of a heavy dead swell, which was gradually subsiding. The proofs on both sides show that after the Alpena had got well under way with her tow the weather became settled and very fine, and so continued until arrival in port. As to the depth of water in the hold of the Hyderabad there is sharp conflict in the evidence, but I regard the testimony of the witnesses sworn on the part of the libellants as most reliable on the question. They testify that her pumps were kept in constant operation throughout the night when she was taken in tow, and until 8 o'clock on the following morning. The mate of the Hyderabad testifies that when he and the vessel's crew went aboard of her from the

tug there were two feet of water in her hold. That was after a night of continuous pumping, and the concurrent testimony of witnesses on both sides is that the pumps were worked more or less from that time until the vessel reached Milwaukee. How deep she lay in the water when discovered by the Alpena is not conclusively shown. Her scuppers appear to have been in order after the collision, so as to permit the escape of water from her decks, and yet some of the libellants' witnesses testify that there was water on her decks when they boarded her. One fact is evident, that she was not so deep in the water as to make it impracticable to take her in tow, nor does there appear to have been much difficulty experienced—her pumps being kept in operation—in towing her into port. And yet it is not to be forgotten that when her cargo was taken out more than one-half of it was found to be in damaged condition; and, of course, helpless exposure of the vessel to the sea, and of the cargo to the action of the water in her hold, would rapidly increase the injury to the cargo. The witness Vance, who examined the cargo after the vessel was brought into port, testifies:

"After the dry wheat was taken out the wet wheat was found all through the hold, and, if I remember rightly, the most of the wet wheat was aft and amidships, and I found it, in some places, wet five or six feet from the bottom of the vessel, and in other places not so much. I judged that most of the water that came into the vessel came in through the hole on her port quarter where a plank was broken, near the water's edge."

It was contended in argument, by claimants' counsel, that when the tug, with the master and crew of the Hyderabad, met the Alpena, the master of the Alpena should have yielded possession of the Hyderabad, and that his refusal so to do should work a forfeiture of all salvage claim, or, at least, greatly reduce it. The finders of the wrecked vessel having originally taken lawful possession of her, had the right as salvors to retain possession until their just demands should be paid, or until the vessel should be taken into the custody of the law preparatory to the amount of salvage being legally ascertained. *The Gilpin, supra.* At the same time it is not permissible under such circumstances for the salvors to unreasonably exclude the master and crew of the wrecked vessel from all relation to and interest in the property; and in determining the amount of salvage to be here awarded, the court should take into consideration the fact that the master and crew of the Hyderabad were in pursuit of her with a tug, and that they encountered her in tow of the Alpena within eight or ten hours after she had been found, and accompanied her to port, as

a fact bearing upon the probability that she would have been ultimately rescued by her own crew without the intervention of the Alpena.

The libellants ask the allowance of, at least, a moiety of the value of the salved property. The claimants have tendered $1,500, but insist that the court should not award an amount exceeding $500. Considering all the circumstances I shall allow as salvage the sum of $1,750. As questions are raised touching the alleged wrongful appropriation by some of the crew of the Alpena of articles of personal property belonging to the crew of the Hyderabad, and consequently of their right to share in the award now made, distribution will not be ordered until further hearing on the question of apportionment.

Decree accordingly.

### NOTE.

TOWAGE AS SALVAGE SERVICE. Towing may be salvage service when performed in aid of a vessel in distress. *The H. B. Foster*, Abb. Adm. 222; *The Reward*, 1 W. Rob. 176; *The Graces*, 2 W. Rob. 294; *The Meg Merrilies*, 3 Hag. Adm. 346; *The Jane*, 2 Hag. Adm. 338; *The Traveler*, 3 Hag. Adm. 370; *The London Merchant*, Id. 401; *The Birdie*, 7 Blatchf. 243; *The Swiftsure*, 4 FED. REP. 463; *The Mary E. Long*, 7 FED. REP. 364. Although an abandoned vessel might have been saved by her crew returning to her, had the steamer not gone to her aid, it is a case of salvage. *The Joseph C. Griggs*, 1 Ben. 83. Taking in tow a vessel disabled and in distress cannot be compared to an ordinary towage service, (*The Rebecca Clyde*, 5 Ben. 103; *The Charles Adolphe*, Swab. 153; *The Paris*, 1 Spinks, Ec. & Ad. 289;) as where a vessel has received injury or damage. *The Saragossa*, 1 Ben. 551. It is sufficient if the damage or misfortune might expose the vessel to destruction. Id. *The Cornelius Gunnell*, 16 Law Rep. (N. S.) 677. A situation of actual apprehension, though not of actual danger, makes a case of salvage compensation. *The Joseph C. Griggs*, 1 Ben. 83; *The Raikes*, 1 Hag. Adm. 247; *The Henry Ewbank*, 1 Sumn. 400.

DERELICT. To constitute a case of derelict the vessel must have been finally abandoned, (*Tyson* v. *Pryor*, 1 Gall. 133; *The Island City*, 1 Black, 121; *The Jenny Lind*, Newb. 449; *The T. P. Leathers*, Id. 421; *The Ida L. Howard*, 1 Low. 7; *The Sarah Bell*, 4 No. of Cas. 147,) without hope of recovery and without intention of returning to it. *The Elizabeth and Jane*, 1 Ware 35; *The Boston*, 1 Sumn. 328; *The Emulous*, Id. 210; *The Henry Ewbank*, Id. 400; *The H. B. Foster*, Abb. Adm. 222; *The Allacapas*, 3 Ware, 65; *The Aquila*, 1 C. Rob. 32; *The Leander*, Bee, 260; *L'Esperance*, Dods. 46. The mere quitting of the ship to procure assistance, and with intention to return, is not an abandonment. *The Emulous*, 1 Sumn. 210; *The Island City*, 1 Cliff. 224; *The Boston*, 1 Sumn. 328; *The Beaver*, 3 C. Rob. 92. Salvage was allowed in a case where the vessel, with its cargo, was found water-logged, abandoned, and apparently—though in fact not—derelict. *The Senator*, 1 Brown, Adm. 372.

POSSESSION BY SALVORS. A vessel, in point of fact, for 12 or 14 hours in a condition where her instant destruction is menaced, and the lives of those who might remain on board were greatly jeopardized, may be rightly taken possession of by salvors. *The John Gilpin*, Olcott, 80; *The Dodge Healy*, 4 Wash. C. C. 651. Unless a vessel has been utterly abandoned, and is in contemplation of law a *derelict*, even *bona fide* salvors have no right to the exclusive possession, and are bound to give up charge to the master on his appearing and claiming charge. *The Cleone*, 6 FED. REP. 517.—[ED.

See *The Sandringham*, 10 FED. REP. and note, 556; Id. 581; *The Leipsic*, Id. 585, and note; Id. 591; *McConnochie* v. *Kerr*, 9 FED. REP. 50; *The Plymouth Rock*, Id. 413; *The Emily B. Souder*, 15 Blatchf. 185; *The Ellora*, 1 Lush. 550.