**DANNER et al. v. UNITED STATES.**

**THE ROYAL OAK.**

United States District Court
S. D. New York.

July 18, 1951.

Max Lustig, New York City, Jack Steinman, New York City, for libellants.

Irving H. Saypol, Martin J. Norris, and Edward R. Downing, all of New York City, for respondents.

BONDY, District Judge.

This is a libel by 35 members of the crew of the S.S. Lookout for salvage services rendered to the S.S. Royal Oak.

The S.S. Royal Oak was a tanker owned and operated by the United States, and carrying a cargo of gasoline and some Diesel oil. Some of her cargo tanks were empty. About 1:15 P.M. on February 26, 1947, she stranded on a reef off Point Galera, Ecuador, about ten miles from the coast. A number of her tanks were ripped open and she soon listed about 25 degrees to port, which list caused lubricating oil to spill on the main generator of her turbo-electric engine. The oil caught fire, and soon the entire engine-room was in flames, which spurted out above the after part of the main deck. The fire rendered the engine useless and deprived the ship of all means of navigation and of fighting the fire, and her list increased further to almost 30 degrees.

The master, Captain Page, fearing that the cargo of gasoline might catch fire and cause an explosion which would endanger the lives of his men, ordered the Royal

Oak abandoned, without intending to lose contact with his ship. After the watertight doors had been shut and the engine-room flooded with carbon dioxide gas, all the crew except the master and radio operator left the ship.

At 1:18 P.M., a message was radioed: "SS Royal Oak sinking off Point Galera, tanker. Main engine on fire. 30 degree list." At 1:40 another message was sent: "Abandoning ship. Will put on emergency transmitter with automatic keyer so you can take bearing by direction finder." Thereafter the master and radio operator jumped from the ship and were picked up by the lifeboats.

On account of the danger of an explosion, the three lifeboats pulled a safe distance away from the ship. Just as they were preparing to head for the shore the S.S. Lookout was sighted on the horizon and the lifeboats made for the Lookout.

The Lookout was a C–2 type cargo vessel operated by the Grace Line. She received both distress messages from the Royal Oak and, after communicating with the United States naval authorities in the Panama Canal Zone, varied her course slightly and proceeded towards the Royal Oak. At 3:07 P.M., the Lookout sighted the burning Royal Oak.

About 4:00 P.M., the Lookout picked up the entire ship's company of the Royal Oak from the lifeboats, and anchored about five miles from the Royal Oak. About 6:00 P.M., Captain Page, having recovered from shock, went to the Royal Oak with four officers and about fifteen men of his crew. All these except the master and the four officers returned to the Lookout at about 8:00 P.M. The four officers found that the main fire in the Royal Oak's engine-room had almost died out and that the cargo of gasoline had not caught fire. Small fires in various places were put out with fire extinguishers.

About 2:00 A.M. the next morning, the Royal Oak's list began to increase, and some time thereafter the high tide floated her free of the reef, and her list then increased further to about 36 degrees. The five men aboard the ship, fearing that she might capsize or sink, signalled to the Lookout that they desired to be taken off. At about 3:30 A.M., a boat was dispatched from the Lookout; when it arrived at the side of the Royal Oak, the four officers were packing personal gear, so that the lifeboat, with the master, the four officers, and some eight to fifteen suitcases aboard, did not get back to the Lookout until about 7:20 A.M.

After the Royal Oak was free she drifted in a northeasterly direction, almost parallel with but possibly slightly inward towards the shore, at about one knot.

Later that morning, February 27, Ecuadorian officials came aboard the Lookout and conferred with her master, Captain Halterman. Captain Page of the Royal Oak was not asked to attend this conference. Shortly thereafter, Captain Halterman decided to take the Royal Oak in tow. Accordingly, at about 11:00 A.M., a lifeboat was dispatched to the Royal Oak with the Lookout's Chief Mate Daly and eight other men from the Lookout, and the Royal Oak's Chief Mate Hollywood and four other men from the Royal Oak, to rig towing gear. About 12:45 P.M. the boat returned to the Lookout's side with gear that had been packed by the Royal Oak's men. By 3:30 P.M., the tow lines had been secured and the tow then proceeded at very slow speed until noon of the following day, February 28, when one of the tow lines parted. A Lookout lifeboat containing the Lookout's chief mate and approximately eleven other members of her crew, as well as the Royal Oak's Second Mate Sorensen (who went along to get the Royal Oak's chronometers) proceeded to repair the parted line and to run another line, and thereafter the tow was resumed.

About 3:00 P.M. on February 28, a lifeboat containing members of both crews was dispatched to the Royal Oak to remove provisions from the latter, with her master's permission, in order to provide for the increased number of men aboard the Lookout.

At approximately 7:20 that evening, the Lookout sighted the U.S.S. Recovery, a naval vessel which had been sent from the

Canal Zone to aid in salving the Royal Oak. The following morning, March 1, the Recovery took over the Royal Oak from the Lookout, giving a "receipt" which recited that "this transfer * * * will not relinquish any salvage rights of the S.S. Lookout, Grace Line, Master, crew and Cadets. * * *" The entire crew of the Royal Oak was taken aboard the Recovery, and the latter, with the aid of the tug Favorite, which arrived about noon of March 1, brought the Royal Oak safely to Balboa in the Canal Zone on March 6 after towing her 371 miles in six days.

The salvage services rendered to the Royal Oak and her crew by the Lookout extended over a period of almost three days, during which time the Royal Oak was towed a total of 99 miles by the Lookout. The sea during this period ranged from smooth to moderate, with the wind from Force 1 to Force 5.

The value of the Royal Oak in sound condition was $1,860,000.00, and her value after the stranding and fire was $1,414,071.91. Her cargo was worth $140,121.23; thus the total value of the property salved was $1,554,193.14. The value of the Lookout was $1,050,000.00.

The foregoing facts have either been stipulated by the parties or are clearly established by the record.

The Government does not deny that salvage services were rendered to the Royal Oak by the Lookout's crew but contends that these were of a low order, and that the salvors so misconducted themselves as to require a total forfeiture of any award to which they might otherwise be entitled.

The record discloses that there was some friction between the crews of the Royal Oak and Lookout during the almost three days that both crews were on the Lookout, and much more between the two masters.

It appears that during the morning of February 27, before preparations for towing the Royal Oak had begun, there was drafted a document reading in part:

"To Whom It May Concern:

"We the undersigned have mutually agreed with the consent of the Master of the S.S. Lookout to salvage the S.S. Royal Oak which has been abandoned by all of its crew members, including the Master.

"It has been further agreed that any funds received as a result of salvage shall be divided share and share alike amongst all crew members including the Master of the S.S. Lookout."

This agreement was signed by one delegate from each of the Lookout's deck, engine, and steward departments, and by her master, "representing all Officers, and Cadets."

Later that morning, when Captain Halterman had decided to tow the Royal Oak, Captain Page said that he was going back aboard his ship, and Captain Halterman replied: "You are not going aboard the ship. I am master of this vessel. You will do as I say." Chief Mate Hollywood of the Royal Oak testified that he heard Captain Halterman say to Captain Page: "No, it will be done my way." However, Halterman permitted Hollywood and a few others of the Royal Oak's crew to go over to their ship.

Shortly thereafter a lifeboat with Chief Mate Daly and eight other Lookout men and Chief Mate Hollywood and four other Royal Oak men proceeded to the Royal Oak to rig tow lines. Thereafter, about nine other members of the Lookout's crew, who said that they were volunteering to go to the Royal Oak to aid in the rigging, came over to the Royal Oak in a second lifeboat, but on reaching her, most of these men at once scattered below deck and started to go through the rooms. The Royal Oak's Second Mate Sorensen stated in his deposition that when he came into the chart room, he found the chart drawers open and charts strewn over the floor, while one of the Lookout men was going through the tool box, and another attempting to pry a barometer off the bulkhead. This man told Sorensen, "You have no more authority on here," and that that stuff belonged to them (the salvors), and that he would take the barometer home with him. Sorensen thereupon informed both men that the equipment and stores aboard the ship were the property of the United States Government.

About half an hour later, Sorensen went to his room. There were five Lookout men in it, and the room was completely ransacked. He found the dresser drawers broken open and their contents gone. He lost "twelve suits of khaki, a suit of clothes, twelve Arrow shirts, underclothes, socks and shoes." In the Captain's office, Sorensen observed that a large filing cabinet had been pried open and its contents strewn over the deck, and that an attempt had been made to pry open the safe and to knock off its combination lock.

Sorensen further stated that the next day, February 28, when one of the tow lines parted, he, on Captain Page's orders, went along in the lifeboat sent out to repair the line, in order to bring back the Royal Oak's chronometers. On coming into the chart room, he again found five Lookout men rifling the chart drawers. After Sorensen had taken the chronometers from their locked case, he encountered the Lookout's junior third assistant engineer, who remarked: "It is a good thing you beat me to them, because that is exactly what I came over for." Sorensen likewise observed a Lookout man trying to break into the bonded storeroom with a fire axe. On being informed that it was a bonded storeroom, he replied that he knew that and that that was precisely the reason why he wished to get in there.

Among those who went over in the first lifeboat on February 27 was the Royal Oak's Chief Mate Hollywood. He testified that later that morning, while helping with the rigging work at the ship's stern, he noticed a little pile of tools and other small items, including a fan and a ship's clock, in the vicinity of the fantail. Shortly thereafter, Hollywood saw a Lookout man wearing a captain's uniform cap, and another a chief engineer's cap. One of these men was holding in his hand a twelve inch electric fan of the type found throughout the Royal Oak. One of them also said that if he had had more time, he would have had the Scott radio receiver which was in the master's office.

Hollywood thereupon remonstrated with Daly and told him that the looted equipment was the property of the United States, but Daly merely shrugged his shoulders. One of the Lookout men, hearing Hollywood complain to Daly, placed his hand on the bulkhead and said: "I claim this ship as salvage." Hollywood then looked around and found that his room and the adjoining purser's office had been ransacked. The master's office had a similar ransacked look, and the Scott radio receiver, a heavy instrument, had been unbolted from its standard mounting, and moved from its original position. Upon returning to the Lookout later that afternoon, Hollywood reported what he had observed to Captain Page. Captain Page spoke to Captain Halterman, and the latter posted notices requesting all Lookout men to return any property that had been taken from the Royal Oak. Some articles, including tachometers, cameras, and a pistol, were apparently turned over to Captain Halterman voluntarily; others were recovered in a subsequent search of the Lookout.

The deposition of Crater, then an able-bodied seaman on the Royal Oak, discloses that other rooms had also been looted, that the slop chest had been broken into, and that he himself lost a pair of boots, a leather jacket, and some rain gear. The deposition of Gracy, then the Royal Oak's second engineer, discloses that the clocks in the Royal Oak's engine and fire-rooms had been removed, that all the new tools in the machine shop had been looted, and that the Lookout's second engineer told him of finding property belonging to the Royal Oak's men secreted in the Lookout's fire-room, which he then turned over to Captain Halterman; that he (Gracy) found his desk broken open, that he saw some of his property, including cigars and a pair of shoes, in the possession of Lookout men, and that he was ultimately reimbursed by the United States for loss of personal property in the sum of $300.00 to $400.00.

Although the libellants have vigorously denied that there were more than two trips by a lifeboat during the period of rigging operations on February 27, the court is fully convinced by the testimony of a number of disinterested witnesses that there were in fact a number of other trips between the two vessels by one or

more lifeboats during this time. This conclusion is not affected by the fact that only two trips during this period were recorded in the Lookout's logbook, because only the lowering and hoisting of a lifeboat in its davits, but not each trip while it was in the water, would customarily be shown in the log.

The court finds that a number of the Lookout's crew, certainly five, and probably eight or more, went aboard the Royal Oak without express orders and not with the intention and purpose of aiding Daly and Hollywood in their rigging work, but to take from the Royal Oak whatever they might be able to appropriate to themselves. Part of their booty was brought to the Lookout wrapped in pillow cases and sheets or stuffed into seabags; other items, for example a radio belonging to a Royal Oak man, were not even so concealed. Various other property belonging to the Royal Oak and her crew, including a binocular case and a valuable camera, was later seen in the possession of Lookout men. Other things, such as a suitcase belonging to the radio operator, were apparently never recovered.

Although the Royal Oak's stranding and her sharp list undoubtedly created some disorder in many quarters, and although some of the Royal Oak's crew during the progress of the rigging operations recovered some of their personal possessions, these facts do not lessen the weight of the evidence as to looting. Whereas most of the persons who testified in person or whose depositions were introduced on defendant's behalf were disinterested, the testimony in behalf of libellant was given by witnesses interested in the result of this action. See The Boston, 3 Fed.Cas. pp. 932, 938, No. 1,673.

The court does not doubt that there was a flagrant looting of the Royal Oak's equipment and of personal gear belonging to her officers and men, and that there were many acts of vandalism and spoliation by a substantial number of men from the Lookout's crew. This looting was open and obvious; and it seems probable that it was carried on not only with the knowledge but also the acquiescence of other members of the Lookout's crew who did not themselves board the Royal Oak. The court further concludes that the master and officers of the Lookout were negligent in not taking adequate and forceful measures to prevent looting in the first place, or at least in stopping it after complaints had been made to Daly and Captain Halterman. They were likewise at fault in failing to exert themselves to the utmost to secure the restitution of property already converted by the men under their command.

Many of the Lookout's crew believed that in a situation such as was presented here, the salvors become owners of the salved vessel and everything aboard her, and that they might therefore appropriate to their own use whatever they desired. The fact that their conduct was based on a mistaken conception of their legal rights, however honest does not affect the consequences of that conduct. Cf. The Mabel, 9 Cir., 1932, 61 F.2d 537, 540. At least some of the Lookout's crew appear to have realized the wrongfulness of their conduct. Thus when it was rumored that the Coast Guard might search the Lookout, some Lookout men expressed the fear that they might have to throw "the stuff" out of the porthole. Furthermore, Captain Halterman's notices, posted in several places, must have made clear to them that their conduct was not justifiable.

The actions of the Lookout's master and crew appear to have been induced largely by a desire to benefit as much as possible from the salvage operation. The refusal to let Captain Page reboard his own vessel when the tow lines were to be rigged and the refusal to permit more than a few Royal Oak men to participate in that work indicate a calculated plan to obtain the largest possible award for the salvage operation. Though such an attitude may not by itself work a forfeiture of the salvors' claims, courts of admiralty in salvage cases, while rewarding meritorious and selfless service most generously and far in excess of a mere quantum meruit, likewise require of those seeking such liberal reward the highest standards of conduct and good faith.

The law applicable to cases in which embezzlement and other misconduct were open and notorious and the guilty individuals can not·be identified, and in which the master and officers failed to meet the required high standard of vigilance in protecting the helpless vessel .that was being salved, can not be better stated than it was in Cromwell v. The Island City, 1862, 1 Black 121, 66 U.S. 121, 130, 17 L.Ed. 70, where the Supreme Court quotes and adopts the language of Justice ·Clifford who had heard the appeal from the District ·Court while sitting as circuit judge. 6 Fed.Cas. pp. 859, 862, No. 3,410:

"Public policy encourages the hardy and industrious mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to embezzlement and dishonesty, the law allows him, in case he is successful, a liberal compensation. Those liberal rules as to remuneration were adopted and are administered, not only as an inducement to the daring to embark in such enterprises, but to withdraw as far as possible every motive from the salvors to depredate upon the property of the unfortunate owner. While the law is thus liberal as to compensation, it requires on the part of the salvors the most scrupulous fidelity. It visits, says a learned judge, any embezzlement, although small, with an entire forfeiture of all claim for salvage. It not only withholds the extraordinary reward allowed to the honest salvor as a premium for his courage and hardihood, but, by way of penalty for his fraud, deprives him even of a *quantum meruit* for his labor. * * * While the general interests of society require that the most powerful inducements should be held out to men to save life and property about to perish at sea, they also require * * * that those inducements should likewise be held forth to a. fair and upright conduct with regard to the objects preserved. * * * compensation for salvage service presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach or under the control of the salvors. Salvors are required by the nature of their undertaking, and by a due consideration of the large award allowed them for their services, to be vigilant in preventing, detecting, and exposing every act of plunder upon the property saved; and if they are guilty of embezzlement, whether at sea, in port, or even after the property is delivered into the custody of the law, it works a forfeiture of their claim to salvage. When secret, and purely an individual act, it is justly held not to prejudice co-salvors who are innocent. But all may become guilty by consenting thereto, or by connivance, concealment or encouragement afforded to the actors, or by not preventing the act when it is in their power."

The Court, in the last paragraph of its opinion, summarized the evidence of embezzlement, which was certainly not greater than that in the present case, and held that it fully established the necessity of a total forfeiture.

Likewise, in the Bello Corrunes, 6 Wheat. 152, 19 U.S. 152 at page 173, 5 L.Ed. 229, the Supreme Court said:

"As to the claims of the salvors, it may be remarked, that maritime courts always approach them with great benignity and favor. Yet, in proportion to the inclination to favor where there is merit, is the indignation with which they view every indication of a disposition to take advantage of the unfortunate. Spoliation, and even gross neglect, may forfeit all the pretensions of salvors to compensation."

Applications of this rule may be found in many other cases. See e. g., Albury v. Cargo of the Lugano, D.C., 215 F. 963, affirmed *sub. nom.* The Lugano, 5 Cir., 222 F. 230; The Boston, supra; Roberts v. The St. James, D.C., 20 Fed.Cas. p. 921, No. 11,914.

Cases cited by libellants, e. g. Breving v. The Lloyd Cuarto, D.C., 84 F.Supp. 33, illustrate factual situations which do not call for an application of the rule of total forfeiture.

▌ It follows that the libel must be dismissed as to all the libellants.

The foregoing shall constitute findings of fact and conclusions of law, unless the parties desire more detailed findings, in which event they may be submitted upon notice.

Submit decree accordingly.