## ALBURY et al. v. CARGO OF THE LUGANO.

### (District Court, S. D. Florida. November 6, 1913.)

1. **SALVAGE (§ 40*)—PRIORITY OF LIEN—CUSTOMS DUTIES OF SALVED CARGO.**

   Claims for salvage are entitled to priority of payment over customs duties from the proceeds of cargo salved from a foreign ship and brought into the United States.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. § 105; Dec. Dig. § 40.*]

2. **SALVAGE (§ 38*)—AMOUNT OF COMPENSATION—SAVING CARGO OF STRANDED STEAMSHIP.**

   Awards of 30, 45, and 50 per cent. of the salved value of cargo from a stranded British steamship, made respectively in favor of the three vessels which performed the services and brought in the cargo, according to the labor and degree of peril involved in each instance.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102; Dec. Dig. § 38.*]

3. **SALVAGE (§ 27*)—COMPUTATION—COSTS AND EXPENSES.**

   The question what items of costs and expenses payable from the proceeds of salved goods should be deducted before salvage claims are computed considered.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66; Dec. Dig. § 27.*]

4. **CUSTOMS DUTIES (§ 23*)—GOODS SUBJECT TO DUTY—SALVAGE OF FOREIGN CARGO.**

   The United States has an equitable claim for customs duties on the proceeds of foreign goods brought into an American port by salvors from a wrecked vessel, and which on being sold in the salvage proceedings enter into the consumption of the country, but not with respect to such goods as on such sale are exported.

   [Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 19, 20; Dec. Dig. § 23.*]

5. **SALVAGE (§ 21*)—RIGHT TO COMPENSATION—EMBEZZLEMENT OF SALVED PROPERTY.**

   A vessel which, after aiding in salving the cargo of a wrecked vessel, fails to turn over to the court all of the property saved by her forfeits all right to salvage compensation.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 48–51; Dec. Dig. § 21.*]

In Admiralty. Suit by Dunham Albury and others against the cargo salved from the British steamship Lugano. Decree distributing proceeds.

Eugene O. Locke, of Jacksonville, Fla., for libelants.
G. Bowne Patterson, of Key West, Fla., for claimants.
Herbert S. Phillips, U. S. Atty., of Tampa, Fla.

CALL, District Judge. The libel in this case claiming salvage was filed on March 29, 1913, and process issued on that day. The marshal, in pursuance of such process, seized and took into his possession the goods libeled. On April 19, 1913, an amended libel was filed, setting out the names of all the libelants. On May 27, 1913, the master of the steamship as claimant filed his answer to the amended libel. On Au-

---

gust 22, 1913, the United States filed its intervention, claiming duties on the salved goods to the amount of $95,893.61, and claiming the duties as a first lien on the salved goods and certain expenses amounting to something over $1,800. August 18th to 30th the property was sold under order of court. Upon the pleadings and the testimony taken the cause came on to be heard upon the 5th day of May, 1914.

The goods salved were brought into Key West under three consortships, and in the sale of the goods, the amounts realized from each consortship are shown to be as follows:

First consortship............................................. $64,126 67
Second consortship............................................ 14,084 30
Third consortship............................................. 2,228 18

The evidence shows that the Dr. Lykes, a schooner engaged in the salvage work making two trips with cargo, was short in the delivery of goods to the amount of $934.06 and over in the amount of $137.90. No attempt has been made in the evidence to account for this discrepancy of receipt and delivery of cargo by the officers, crew, or owner of the Dr. Lykes.

The facts as shown by the evidence are as follows: During the night of March 9, 1913, the British steamship Lugano, while on a voyage from Vigo, Spain, to Havana, Cuba, loaded with a general cargo, went ashore on Long Reef, one of the reefs off the coast of Florida. On the morning of March 10, 1913, Dunham Albury, a licensed wrecker, boarded her, and his services and those of his consorts were accepted by the master to save the ship and cargo. The evidence makes it very probable that the ship bilged when she went upon the reef. The salvors worked from March 10th to March 21st, in gangs, day and night, hoisting out cargo and loading it upon the several boats, using the ship's steam and machinery, except for two days when the water flooded the boiler room and cut off the steam from the donkey engine, whereupon the salvors procured pumps from Miami, and thereby reduced the water in the boiler room so that steam could once more be obtained, and used the ship's power once more in discharging cargo. All the cargo saved was carried to Key West, about 150 miles distant, and stored, except as above noted, by the schooner Dr. Lykes. The weather during this period was stormy, and several of the vessels of the salvors were injured. On March 22d the salvors gave up hope of saving the ship, and discontinued their work upon it on account of the heavy weather. During the time between March 22d and April 3d efforts were made by some of the salvors under contract with the owners of the vessel to float her, without avail, for which no claim is made in this case. On April 4th they returned to work, saving cargo, and worked until the 15th of that month. The cargo saved in the first consortship was not damaged and injured by water; that saved in the second consortship was about half wet and half dry; that saved in the third consortship was wet, consisting of barrels of wine and glass. In saving the goods salved in the first and second consorts the men were required to stand in water in breaking out the cargo ranging from a few inches to some feet. In salving the goods saved in the third consortship the men were required to work in the water, diving in many

instances to get the goods. This water had become very bad on account of the rice, flour, and caustic soda in the cargo, and the fumes made some of the salvors and members of the crew sick, and the caustic soda in the water inflamed the eyes, bodies, and limbs of the men working in it. It was also necessary for the men to clear the suction of the pump used in keeping the boiler room clear of water by diving and cleaning it with their hands. The ship was listed about 15 degrees as she lay upon the reef. There were engaged in this service some 80 vessels of all kinds, schooners, sloops, and boats, aggregating over 1,000 tons, and nearly 500 men in the first consortship and fewer vessels and men in the second and third.

The questions to be decided by this court are four: First, The priority of the claims of the salvors and the United States; second, the amount of salvage to be allowed the salvors; third, the items of costs to be paid before the allowance of any amount for salvage; fourth, the amount to be allowed for customs duties on sale of the goods that were sold and were consumed in the United States.

[1] The question whether the duties upon the cargo brought into Key West by the salvors should be paid prior to the allowance of salvage was before the District Court for the Eastern District of New York, and decided by Judge Benedict adversely to the claims of the government, as set forth in its intervention in this case, and I have not been cited to any authority holding a contrary view. Judge Benedict fully discusses the questions involved, and the authorities bearing upon the questions, and a further discussion of the question by me is unnecessary. Merritt v. One Package of Merchandise, etc., and other cases (D. C.) 30 Fed. 195. On the authority of these cases and others bearing upon the question, but not directly in point, I hold that the salvors have the prior right to be paid salvage before any duties can be allowed the United States.

[2] The next question to be considered is the amount to be allowed the salvors for their services in saving the property. There can be no question but that the service is a salvage service. In fixing the amount of salvage, the court will be governed by the consideration of the following elements: (1) Labor expended by salvors in rendering the salvage service; (2) promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; (6) the degree of danger from which the property was rescued. The Blackwall, 10 Wall. 14, 19 L. Ed. 870.

The court further say in that opinion:

"Compensation as salvage is not viewed by the Admiralty Courts merely as pay, on the principle of a quantum meruit or as a remuneration pro opere et labore, but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property."

Authorities could be multiplied on this subject, but it would be of no particular value in this case.

Applying these principles to the case under consideration, and bearing in mind the circumstances under which this cargo was saved, what is a proper amount to allow the salvors? The amount for which the property was sold must be the guide to this court of the value of the salved property. After viewing all the circumstances of this case, in the light of the principles announced by the courts in salvage cases, and bearing in mind that salvage should not amount to forfeiture, I am of the opinion that the proper amount of salvage to be allowed in this case, to be calculated and to be distributed, according to the rules of this court, is as follows: Thirty per cent. on the value of the goods saved by the first consort; 45 per cent. on the value of the goods saved by the second consort, and 50 per cent. on the value of the goods saved by the third consort.

[3] This brings me to the consideration of the item of cost, proper to be charged against the fund before salvage is calculated. Of course, all court costs, costs of storage, care of property, sale, etc., are first deducted. And in addition to these certain other cost bills have been presented, among them the consignee's bill. This last has been paid under order of this court, dated January 22, 1914, but I do not understand this order as settling the question whether or not it should be paid before salvage calculated. I have therefore examined the items of this bill; and, while it is entirely proper that it should be paid out of the money in the registry of this court, there are certain items that should be paid from the residue, and not from the fund before salvage calculated. These items are represented by vouchers attached to consignee's bill, and are not allowed against the salvage, as follows, to wit: Vouchers Nos. 1, 2, 3, 8, 9, 10, 18, 19, 20, 21, 23, 26, 27, 35, 36, 37, 38, 42, 43, 44, 45, 46, 47, 48, 51, 52, and 53.

At the hearing a bill was presented for services rendered by an expert in classifying the salved cargo. In my opinion this bill should be paid from the proceeds in the registry of the court, before the salvage is calculated.

There is also a bill of expenses incurred by the United States, presented at the hearing. It appears that the services were rendered while the goods were in the custody of the marshal of this court under attachment issued herein. The sections under which the Collector of Customs acted are not applicable to goods brought in as these were, and in custodia legis; said claim is therefore disallowed.

[4] The only remaining question is, What amount shall be allowed the United States for duties? It is well settled by adjudications that the United States has an equitable claim for duties on all such goods as were sold and entered into the consumption of the country. See cases cited in Fed. vol. 30, p. 195.

In this case evidence has been adduced showing that quite an amount of these goods were exported for which no duties can be allowed. It is the opinion of the court that, after deducting the amount for which the exported goods were sold from the residue, after the payment of costs chargeable against such residue, 30 per cent. of amount left in the registry of the court shall be paid to the United States in satisfaction of its claim for duties. The amount remaining after such

payment shall be paid to claimants upon filing claims as their interests appear.

[5] There is one other question that must be decided by the court in this case, that of the shortage of cargo by the schooner Dr. Lykes. The evidence leaves no doubt that she was short in her cargo something like $800 after deducting the overages. "Punctilious honesty is required of salvors. Embezzlement, however small in amount, whether at sea, in port, or after the goods are in the custody of the law, works a forfeiture of all salvage," says Judge Marvin in section 220 of his work on Salvage. In this case there has been no attempt to explain this shortage by the master or crew of the Dr. Lykes. The only thing in the testimony is a conversation testified to by a witness with the master of the schooner, in which the master is quoted as saying, "he could not help it." It would appear to the court that this case is one of flagrant carelessness, if not worse.

It is therefore ordered that the shares of the master and crew of the schooner Dr. Lykes be forfeited to the use and benefit of the owners of the property.

The decree will be entered in accordance with this opinion.